YOUNG et al. v. TERRITORY OF HAWAII.

No. 11228.

Circuit Court of Appeals, Ninth Circuit.

Aug. 26, 1947.

Fred Patterson and E. J. Botts, both of Honolulu, T. H., and Herbert Chamberlin, of San Francisco, Cal., for appellants.

C. Nils Tavares, Atty. Gen., W. Z. Fairbanks, Pub. Pros., of Honolulu, T. H., and John E. Parks, Sp. Deputy Atty. Gen., for appellee.

Before GARRECHT, STEPHENS and BONE, Circuit Judges.

GARRECHT, Circuit Judge.

The appellants were convicted by a jury in the First Circuit Court of Hawaii of the crimes of murder in the second degree and abortion. The judgment of conviction was affirmed by the Supreme Court of the Territory of Hawaii. 37 Haw. 189.

A careful reading of the 1,000-page printed record convinces us that the appellee adduced ample evidence to sustain the conviction. Summarized, the evidence was as follows:

The appellant Young was a licensed physician of the Territory, and also of the British Empire. The appellant Nozawa described herself as a "nurse" employed in the appellant Young's office, but Dr. Young testified that it would be "more appropriate" to describe her as his "office girl".

On September 19, 1942, Mrs. Gladys Tai Yee, twenty years old, the mother of two children, called at the office of Dr. Ho Quong Pang, her family physician, for the

purpose of ascertaining whether she was pregnant. Judging from the history of her case and relying also upon his own findings, Dr. Pang believed that she was about four weeks pregnant, and he so informed her. She wanted the doctor "to do something to bring on menstruation", but he told her that he "would not perform an abortion on her."

On Friday, September 25, 1942, Mrs. Yee walked out of her home on her way to call at the office of Dr. Young. The appellee produced a parade of relatives and neighbors to prove that she seemed to be in good health when she left her house, and that she had not been sick before consulting Dr. Young. She was not coughing or spitting blood.

Mrs Yee left her home at about 10 or 11 o'clock in the forenoon. Before leaving, she showed her mother $150. Mrs. Yee's husband testified that he had kept about $170 in a peanut can, stowed away in a trunk, and that after her death he found only $20 of that money left. In a statement made at the police station and read at the trial, the husband said that on that day or on the previous day she had told him she "was going to take $150 to pay Dr. Young".

At this point, the narrative of Mrs. Yee's ill-fated visit to Dr. Young's office is taken up in two statements made to detectives by the appellant Nozawa at the Honolulu police station on Tuesday, September 29, 1942. One statement was taken down in shorthand in the morning of that day, and the other, covering much the same ground, was taken in the afternoon. Dr. Young was present when each statement was taken. Miss Nozawa refused to sign either statement.

The first specification of error in the present appeal sets forth that the Supreme Court of the Territory erred in holding that the trial court did not err in admitting these two statements in evidence. The grounds upon which this specification is based will be considered hereinafter.

Dr. Young, Miss Nozawa and other defense witnesses fixed the date of Mrs. Yee's visit as Thursday, September 24, instead of Friday, September 25, although

Miss Nozawa added that she was "not quite sure". The latter date, however, was unanimously agreed upon as the correct one by the Territory's witnesses.

In her statements, Miss Nozawa said that Mrs. Yee came to Dr. Young's office "for delayed menses". Dr. Young examined Mrs. Yee "through the breast" and in the vagina. He consented to relieve her condition relative to the menses. He asked her to lie on the operating table and to remove part of her under-clothing, which she did, placing the removed portion on a chair. Dr. Young then opened her womb with an instrument that looked "like a spoon split in half"—later identified as a speculum—while Miss Nozawa "sterilized the inside [of the womb]" with a substance that she called "mercursen", applied with cotton.

Continuing her statement, Miss Nozawa said that Dr. Young "put jello in" Mrs. Yee's womb. To do this, he used a glass tube with "a silver thing at the point," the glass tube and a silver-colored tube containing the "jello" both being "clinked together", or attached. Probably because of language difficulties, the Japanese girl's testimony at this point was not altogether clear, but evidently she was trying to say that the doctor inserted the glass tube into Mrs. Yee's womb and squeezed the jelly from the container tube, which resembled a toothpaste tube, through the glass tube into the patient's womb.

Dr. Young then gave Mrs. Yee "two codein pills to stop the pains," Miss Nozawa assisted her in putting on her undergarment, and, after resting for about half an hour, the patient left the office in a taxicab called by Miss Nozawa.

While she was giving her first statement, Miss Nozawa was asked by one of the detectives, whether she remembered a girl named Rose Dolim. She replied in the affirmative, and stated that the girl had come into the office for "delayed menses" and that Dr. Young had done "the same to Rose Dolim as he did to Gladys Yee", including the insertion of "the same kind of paste". She also told the detectives that still another girl, a Japanese whose name may or may not have been Kane-

shiro, was put through "the same operation and treatment" in Dr. Young's office as had been performed on Gladys Yee.

Miss Nozawa also stated that "patients that have abortion performed on them pay in cash", and that "no bills are sent to them." She said she knew that it was illegal to perform abortions, but nevertheless she assisted in them.

What happened to Mrs. Yee after she left Dr. Young's office was graphically told by Jack Ho King Yee, the girl's husband.

On Friday, September 25, Yee's mother-in-law called him up while he was at work, and he went home at 1:30 or 2 o'clock in the afternoon. He found his wife lying on the floor, coughing blood, and complaining that she was dizzy. During the whole time that they had been married, she had never coughed blood before. He called up Dr. Young at about 6 P. M. The doctor came over, examined Mrs. Yee, told the family not to get excited, that she was coughing blood because she was excited, and that "the baby could come at night, at 8 o'clock."

Mrs. Yee's condition grew worse as the night wore on. Shortly after midnight, she was unable to talk or to open her eyes. At about 2 o'clock Saturday morning, Yee called up Dr. Young again, and said to him:

"Dr. Young, no matter, I have to take my wife to the hospital to save her life; and her hands all blue already."

Once again Dr. Young came to the house, and once again he attributed Mrs. Yee's condition to her being "excited" and "nervous". This time, however, he left two yellow pills and two white pills to be administered to the patient to relieve her pain and to enable her to sleep better.

During this early morning visit, according to Yee, Dr. Young told him that "the medicine" that was working "inside the stomach" would "kill the baby and pull [it] out". When Yee again insisted that he wanted to take his wife to the hospital, Dr. Young told him not to be worried or excited, and that "the baby may come [at] six o'clock Saturday morning."

Mrs. Yee continued to be unable to talk and "rolled around" in her bed. At 9:30 Saturday morning, Yee went to Dr. Young's office, and repeated his statement that "I must take my wife to the hospital". And once again the doctor tried to reassure Yee, adding:

"If you send her to the hospital it is going to be all jammed up."

At 2:30 or 3 o'clock Saturday afternoon, Yee again telephoned to Dr. Young, saying:

"Dr. Young, I must, in my heart, send my wife to the hospital to save her life, she is almost dying."

Dr. Young once again came to the Yee home, once again asked the family why they were "excited", and told them that "This is going to be all right". Yee also quoted the physician as saying:

"Don't worry, you don't have to send her to the hospital, the baby [is] going to * * * come out along at 8 o'clock."

Dr. Young gave Mrs. Yee two injections "to make her sleep for 12 hours", and left directions that she should be given two more pills at eight o'clock. Yee identified two empty containers of pituitary extract and ergonovine as having contained the material that Dr. Young injected into Mrs. Yee. Dr. Young promised to return to see her at 8 o'clock the following morning, and departed.

About 15 or 20 minutes after Dr. Young left the Yee home, Mrs. Yee died.

Five times within as many minutes, the bereaved husband, who stated on cross-examination that he intended to bring a damage suit against Dr. Young, charged that the latter had killed Mrs. Yee. Obviously referring to the attending physician—and so understood by defense counsel—Yee hurled his accusations:

" * * * he kills my wife. * * * Why he kills my wife; he killed my wife, see. * * * he kills my wife. * * * He kills my wife."

On Sunday morning, September 27, 1942, Dr. Young signed a death certificate for Mrs. Yee giving as the "immediate cause of death" the following:

"Pulmonary congestion and haemoptysis Due to Mitral Stenosis."

Translated into layman's language, this would mean a congestion of the lungs and a spitting of blood, due to the narrowing of the mitral valve of the heart; i.e., the valve that prevents the blood in the left ventricle from returning into the left atrium, or auricle. In still less technical language, "mitral stenosis" could be defined as the leakage of a valve of the heart.

On Monday, September 28, 1942, Dr. Richard K. Chun, assistant city and county physician of Honolulu, performed an autopsy on the body of Mrs. Yee. He found "the valves of the heart to be clear and competent." "In other words", Dr. Chun testified, "they closed tightly, which is the normal function of the valves of the heart."

Dr. Chun signed a death certificate of his own—far different from that filled out by Dr. Young. Dr. Chun's certificate gave the "immediate cause of death" as follows:

"Toxemia, due to extensive gangrenous myometritis of uterus."

On the witness stand, Dr. Chun explained the above to mean that there was an absorption of "a large amount of poison in the body, * * * overwhelming" the vital organs, and causing death. The focus of the poisoning was "found in the uterus where there was extensive destruction of tissue; extensive injury, and destruction of the uterine tissue."

In his certificate, Dr. Chun filled out the blank captioned "Means of injury" as follows:

"An object or agent introduced into the uterine cavity from without."

Dr. Chun testified that both ergonovine and pituitary extract—which Dr. Young admitted having administered to Mrs. Yee —tend "to contract the uterus and expel the fetus". In plainer English, however, the following questions were asked and the following answers were given during the direct examination of Dr. Chun:

"Q. Doctor, from your findings at the autopsy are you able to say whether or not an abortion was performed on Gladys Tai Yee, or attempted? A. Yes. * * *

"Q. Will you tell us your opinion in that respect; is it 'yes' or 'no'? A. Yes, * * *"

Dr. Pang, who was one of the appellants' witnesses in the instant case and who was called by his friend, Dr. Young, as a witness in a previous abortion case, testified that when he examined Mrs. Yee on September 19, as heretofore related, he would have known if she had been suffering from mitral stenosis so badly as to die a week later.

Quite apart from the question of the appellants' guilt or innocence, Dr. Young's diagnosis of "mitral stenosis" has been thoroughly discredited by the results of the autopsy and by the unbiased medical testimony in this case.

On cross-examination, Dr. Young was confronted with his own testimony in the Rose Dolim case. While on the witness stand in the instant case, he admitted that he "did perform an abortion" on Rose Dolim, but contended that it was "a therapeutic one". In the Rose Dolim case, Dr. Young testified as follows:

"Q. Did you ever give any one else this same type of treatment you gave Rose Dilin? A. Yes, I have.

"Q. That is, the packing and the putting in of medicine? A. Yes, I have.

"Q. Given it on many occasions? A. Many, many occasions.

"Q. Many, many occasions? A. Even when I was in London I used to give that, too.

"Q. Did you give it to a girl named Yee? That name is familiar to you, isn't it, Doctor? Gladys Yee? A. I gave her, —yes, I gave her ergot-novine.

"Q. The same type of treatment? A. A similar treatment.

"Q. The same? Did I hear 'similar' or 'same'? A. Similar. * * *

"Q. You say it differed in some respects, the treatment you gave Gladys Yee? A. It differed in some respects.

"Q. What respects? A. I added some added treatment."

It is unnecessary to labor the point further. The entire record clearly establishes the appellants' guilt.

The specifications of error, however, contain two technical attacks upon the judgment of the court below.

1. The first specification asserts that the Supreme Court of the Territory erred in holding that the trial court did not err in admitting in evidence the two statements, already referred to, made by the appellant Nozawa to the detectives. These statements were inadmissible, the appellants contend, because they were made by Miss Nozawa "while she was in illegal custody and restraint, plaintiffs in error having objected to the admission of said exhibits seasonably and produced evidence to show that they were involuntarily made."

Early in the evening of Monday, September 28, 1942, Detectives Albert M. Felix and William Kaina, of the Honolulu police department, went to Miss Nozawa's home and brought her to the police station under arrest. We cannot agree with the holding of the territorial Supreme Court that Miss Nozawa came to the police station voluntarily. 37 Haw. at page 198. Not only is the testimony of the arresting officers clear on that subject, but in their briefs before this court opposing counsel not only agree but insist that Miss Nozawa was under arrest from the time that she was picked up at her home.

The appellants insist, however, that though Miss Nozawa had already been "arrested" when she was brought to the police station, "she was not 'arrested for investigation' under color of section 5404 of the Revised Statutes [Laws] of Hawaii, 1935, [infra] * * * until after she had reached the police station and had denied that she was implicated in the case of Mrs. Yee." The record seems to bear out the appellants' contention, but in our view the point is not important.

On the ride down to the police station, Detective Felix asked Miss Nozawa whether "she knew any facts concerning the treating of Gladys Yee, and she said she didn't know anything about it." He repeated his questioning after they reached the station, and she repeated her reply. She was then "booked * * * for investigation and sent * * * upstairs." On the stand, Felix explained that "we had many statements to take that night".

Miss Nozawa was locked up in a cell in the women's block, where she spent the night. She was returned to her home at 11 o'clock the following night. It is upon her alleged experiences in this cell that are bottomed the appellants' objections to the admission of her statements to the detectives. It is argued that because of the conditions in the cell, Miss Nozawa's subsequent statements could not "possibly be dignified as voluntary". The appellant's argument on this point runs this way:

"The exerting upon Miss Nozawa of the influences of fear and hope are [sic] unmistakable—fear that she would again be subjected to the physical and psychological torture of revolting imprisonment if she did not make a statement—hope that she would be released and allowed to go home as promised if she did make a statement."

As to the "hope" that was held out to Miss Nozawa "that she would be released and allowed to go home as promised if she did make a statement", there is some conflict in the evidence. Both before the trial judge alone, in the absence of the jury, and later also before the jury, Miss Nozawa testified that Detective Felix had promised her that "he would not charge me if I would say like that", and that she would be allowed to go home. She further told the jury that she lied in her statements to the police "because I wanted to go home."

On cross-examination by defense counsel, Felix at first flatly denied that he had promised Miss Nozawa that she could go home as soon as she made a formal statement, then qualified his denial by saying that he could not recall and finally returned to his flat denial that he had made such a promise: "No. I didn't promise anything of the kind." As we shall see hereafter, the voluntary nature of Miss Nozawa's statements was a matter to be determined preliminarily by the trial judge, and ultimately by the trial jury.

We advert now to Miss Nozawa's account of conditions in the cell that she occupied during the night of September 28-29. Her statement before the trial judge, in the absence of the jury, was in part as follows:

"Well, when I went in it was all blacked out. Had no light in there. I walked in,

and I saw a Portuguese girl was laying there. So she saw me, and she said, 'Hello!' I said, 'Hello!' So she said 'What is the idea of the matron locking you in this cell here?' 'Do you know that place is filthy,' she said. I said 'Why?' She said, 'Why don't you come outside?' I could not because the matron locked me in here. She had a key, and she locked me in there and I had to stay in. There was no mattress; no bed; no pillow. There was dirty blanket. And the toilet was filthy with smell, a terrible smell. I had to stay in there the whole night. I had a pain in my stomach. I had menses then. I just sat there and cried the whole night. So the Portuguese girl asked me, 'Hilda, why don't you go to sleep?' I said I couldn't sleep with all the mosquitoes, and bed bugs, and I have a pain down here. I have to scratch all the time. The bugs bit me. I couldn't stand it. So I cried all night long. They took my jacket. They took my belt away from me. I had just my dress. The blanket was dirty. The smell was terrible, I could not put the blanket on me, and I had to stay on the cement, sit on the cement until they called me again."

Miss Nozawa told substantially the same story in the presence of the jury.

Felix testified that the cells in the women's block were provided with toilets, that he had never heard that they "smell", but that he had heard the mattresses and beds contain bedbugs.

On the other hand, Miss Nozawa admitted that Detective Felix "was quite nice" to her throughout his dealings with her. Moreover, her repeated statements that she "made up" one of her answers to the police "of her own accord", and that she answered his question as she did, not because Felix told her to, but because "that thing just came into my mind", might well have led the jury to disbelieve her altogether when she gave her harrowing description of conditions in her cell.

Miss Nozawa's two statements to the detectives bear internal evidence of not having been forced from her. In several instances she declined to answer questions, by remaining mute. Usually, on such occasions, Detective Felix would merely repeat the question, and if Miss Nozawa persisted in her silence, he would drop the matter. At other times, he would not even repeat the question, but would pass on to something else. In no instance did he threaten, cajole or even try to persuade her to answer. Indeed, Felix asked whether she wished "to continue in this statement", whether she cared to answer a particular question, and whether she was "ready to continue with this statement".

Furthermore, from Miss Nozawa's own testimony, the jury could have refused to believe that it was the conditions in her cell that affected her veracity in her statements to the detectives. She declared that in her answers to Felix she "was mixed up with the Dolim case" and didn't know what she was saying. On the other hand, she blamed Felix as "having told me to say that."

In the final analysis, the jury was the ultimate judge of the truth of Miss Nozawa's statements, both as to the conditions in her cell and as to the effect that such conditions had upon her veracity.

As was said by the Supreme Court of Hawaii in Territory v. Pong Chong, 20 Haw. 229, 233—

"It must be conceded that the jurors who tried the case, heard the witnesses testify, observed their demeanor, their intelligence, their appearance, their bias or prejudice, if any, and many other indicia, were in a better position to determine the truth than we are with only the cold record before us."

See also Territory v. Truslow, 27 Haw. 109, 117.

Referring particularly to the determination of whether or not a confession is voluntary, the Supreme Court, in Lyons v. Oklahoma, 322 U.S. 596, 602, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481, used the following language:

"The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess to or deny a suspected participation in a crime. [Cases cited.]

"When conceded facts exist which are irreconcilable with such mental freedom,

regardless of the contrary conclusions of the triers of fact, whether judge or jury, this Court cannot avoid responsibility for such injustice by leaving the burden of adjudication solely in other hands. But when there is a dispute as to whether the acts which are charged to be coercive actually occurred, or where different inferences may fairly be drawn from admitted facts, the trial judge and the jury are not only in a better position to appraise the truth or falsity of the defendant's assertions from the demeanor of the witnesses but the legal duty is upon them to make the decision. [Case cited.]"

Again, in United States v. Mitchell, 322 U.S. 65, 69, 70, 64 S.Ct. 896, 898, 88 L.Ed. 1140, footnote 2, the Court said:

"In both cases Mitchell denied the testimony of the officers that he had in fact made prompt and spontaneous confession and consent to the search of his home, and on the basis of such denial motions were made to exclude the evidence. The trial judges ruled that whether these statements were in fact made in the circumstances narrated were questions of fact for the juries. As such they were left to the juries, and we here accept their verdict as did the court below."

■ The questioning of a suspect while in the custody of police officers is permissible. United States v. Mitchell, supra, 322 U.S. at page 69, 64 S.Ct. 896, 88 L.Ed. 1140; Lyons v. Oklahoma, supra, 322 U.S. at page 601, 64 S.Ct. 1208, 88 L.Ed. 1481; Ziang Sung Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 69 L.Ed. 131.

■ The arrest of Miss Nozawa was lawful, for it was based upon probable cause. The police had been investigating the case since the morning of the previous day, and had interviewed Yee, Dr. Pang, and David Akana, the undertaker, as well as Dr. Young, who had admitted to them that he had attended Mrs. Yee for three days and that she had died.

In Carroll v. United States, 267 U.S. 132, 156, 161, 45 S.Ct. 280, 286, 69 L.Ed. 543, 39 A.L.R. 790, Mr. Chief Justice Taft said:

"The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony."

See also 6 C.J.S., Arrest, § 6, subsec. b. (2), page 587.

The statute of the Territory on this subject accords with the general law. Section 5404 of the Revised Laws of Hawaii, 1935, is as follows:

"Sec. 5404. By policeman without warrant. Policemen, or other officers of justice, in any seaport or town, even in cases where it is not certain that an offense has been committed, may, without warrant, arrest and detain for examination such persons as may be found under such circumstances as justify a reasonable suspicion that they have committed or intend to commit an offense."

Cf. Young v. Hawaii, 9 Cir., 160 F.2d 289, 290, certiorari denied, 67 S.Ct. 1736.

This section has been repeatedly upheld by the territorial Supreme Court. Provisional Government v. Caecires, 9 Haw. 522, 528; Territory v. Sing Kee, 14 Haw. 586, 587; Territory v. Hoo Koon, 22 Haw. 597, 602.

Not only Miss Nozawa's arrest but also her detention was lawful. Such detention was specifically authorized by territorial law. Section 5408 of the Revised Laws, supra, reads thus:

"Sec. 5408. Examination after arrest. It shall be unlawful in all cases of arrest for examination to deny to the person so arrested the right of seeing counsel or a member of his family; or to deny to counsel, or a member of his family, the right to see such person so arrested at any time; or to fail to release or charge such person with a crime within forty-eight hours of his arrest in all cases in which such person is arrested on suspicion of having committed a crime."

As we have seen, Miss Nozawa was released well within the statutory period of forty-eight hours.

■ The fact that the plumbing in Miss Nozawa's cell was drawn into question by her or that she complained of the presence of insect life in her jail quarters was not of itself sufficient to make her statements involuntary. In the first place, the jury,

in view of her admitted lack of veracity, may have disbelieved her statements regarding conditions in her cell or the promises alleged to have been made by Detective Felix. In the second place, mere discomfort in sleeping accommodations does not of itself make a statement involuntary. The Supreme Court has upheld a confession made by a defendant while he was confined and in irons, under an accusation of having committed a capital offense. Sparf and Hansen v. United States, 156 U.S. 51, 52-53, 55, 15 S.Ct. 273, 715, 39 L.Ed. 343.

■ After a careful scrutiny of the entire record, we are of the opinion that there was evidence to support the implied findings of the lower court and of the jury that Miss Nozawa's statements to the detectives were voluntary.

2. The second specification of error sets forth that "the Supreme Court of the Territory of Hawaii erred in holding and finding that the trial court did not err in denying the motion of Peter L. Young for the suppression of evidence (Exhibits 11 and 12 for prosecution) obtained by the police as a result of the search of his premises without a warrant on September 28, 1942; it affirmatively appearing that at the time of said search the said Peter L. Young was in custody, held by the police without warrant or process of any kind, and that he did not waive the requirement of a search warrant for the police to make said search."

We may observe in passing that the above specification is in error as to the date of the seizure. The record shows and in their brief the appellants state that the visit to Dr. Young's office occurred between the statements of Miss Nozawa, which were undoubtedly made on September 29, 1942.

Exhibit 11 was a speculum, which, according to the testimony of Felix, Miss Nozawa turned over to the detectives, and which she told them "was the thing that Doctor Young used to open up Gladys Yee's vagina." "She showed us how to manipulate it," Felix testified. Exhibit 12 was the forceps that she told the officers "was used to swab out Gladys Yee's vagina and womb," according to the detective.

Detective Kaina corroborated the testimony of Felix.

■ The appellant Young moved to suppress these exhibits on the morning of the day set for the opening of the trial, April 26, 1943, but a day before the jury was called, impaneled and sworn. Counsel for the appellee correctly states that the appellants knew that the detectives had this evidence, and had from September, 1942, to April, 1943, within which to file a motion to suppress the exhibits.

The rule is well settled that a motion to suppress should be "timely" (23 C.J.S., Criminal Law, § 1060, subsec. b., page 476) and "seasonable" (Territory v. Young, 32 Haw. 628, 648). A mere last-minute change of counsel, which was shown in this case, cannot excuse so long a delay.

Nevertheless, because of the grave consequences involved for the appellants in this case, we will consider the motion on its merits.

Briefly, the circumstances attending the seizure, as set forth by the appellee's evidence, are these:

After 11 a. m., on September 29, 1942, when the taking of Miss Nozawa's first statement was completed, Detectives Kaina and Felix, Dr. Young, Miss Nozawa, a police photographer and the police matron drove out to Dr. Young's office. Dr. Young "went around and opened the place up." There Miss Nozawa "picked out" and identified the two instruments, as stated.

Detective Felix testified as follows:

"I told Dr. Young, 'These were the two instruments?' and he said, 'No.' I said, 'Well, would it be all right if we have those?' and he said, 'Yes, go ahead, we can buy plenty more; anybody can buy them.'"

In his cross-examination of Felix, even counsel for the appellants seemed to strive to emphasize Dr. Young's willingness to let the detectives have the instruments:

"Q. Now, when you were there on the 29th, Doctor Young was ready, *willing to give you these instruments,* and to give

you all the facilities that he could? A. Yes. He was very—

"Q. Very cooperative? A. Very cooperative." [Emphasis supplied.]

On the witness stand, however, Dr. Young himself denied that he had given the detectives permission to take the instruments for the purpose of evidence in this case against him.

The appellants concede that "the determinative question before the court on this aspect of the appeal is whether Dr. Young waived his constitutional rights." Cf. United States v. Mitchell, supra, 322 U.S. at pages 69, 70, 64 S.Ct. at pages 897, 898, 88 L.Ed. 1140. From a study of all the testimony on this subject, we think that the trial court was justified in believing that he had done so, and accordingly was correct in denying the motion to suppress.

To recapitulate, we hold that, since the appellant Nozawa's statements to the detectives, and the appellant Young's surrender of the two instruments into their hands, were all voluntary, the exhibits complained of were properly admitted in evidence.

Accordingly, there being no error in the record, the judgment is affirmed.