Leonard HALL, Jr., Appellant,

v.

WARDEN, MARYLAND PENITEN-
TIARY, Appellee.

No. 8592.

United States Court of Appeals
Fourth Circuit.

Argued June 7, 1962.

Decided Jan. 17, 1963.

———◆———

William F. Mosner, Towson, Md. (Court-assigned counsel), for appellant.

Robert F. Sweeney, Asst. Atty. Gen., of Maryland (Thomas B. Finan, Atty. Gen. of Maryland, on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

BOREMAN, Circuit Judge.

This is an appeal from an order of the District Court denying relief in habeas corpus proceedings to Leonard Hall, Jr., a prisoner of the State of Maryland. Hall was convicted on November 11, 1959, in the Circuit Court for Baltimore County, Maryland, of first degree murder and sentenced to death. On appeal to the Court of Appeals of Maryland the conviction was affirmed.[1] Relief was then sought under Maryland's Uniform Post Conviction Procedure Act[2] but, after a hearing, relief was denied by the Circuit Court for Baltimore County and leave to appeal was denied by the Court of Appeals of Maryland in an opinion which discussed all the points raised.[3] Application for certiorari was denied by the Supreme Court of the United States.[4]

On November 29, 1961, Hall filed his petition for a writ of habeas corpus in the United States District Court for the District of Maryland and that court issued the writ so that the prisoner "might have an opportunity to present his evidence on all issues." However, at the "hearing," Hall and his counsel declined to present any testimony and elected to submit the case on the transcript of the trial in the state court prepared for the appeal, and the transcript of the hearing held under the Post Conviction Procedure Act.[5] The State also submitted the case on the record. The District Court, after carefully reviewing the transcripts and the decisions of the Maryland State Court, determined that Hall's constitutional rights had not been violated and denied relief.[6]

Pertinent facts will be recited herein but the full opinions in the cases cited in footnotes 1, 3 and 6 should be read in connection with this opinion.

On July 16, 1959, Anna Gaff, 66 years of age, was found stabbed to death in a tavern which she and her husband owned and operated at Essex in Baltimore County, Maryland. Cigar boxes containing cash, checks and certain keys were discovered to be missing from the premises. On the afternoon of that day while the police were searching at the tavern for clues and evidence, Hall, who had been sitting in the tavern, approached one of the officers and asked if he was working on the case and if there were any fingerprints. Hall stated, "Well, if you got fingerprints you will catch the person who did it." He told the officers that he had been in the tavern the night before, that he knew the Gaffs ("Mom and Pop") well, that he often came into the place and that he had stopped in to pay his respects. In response to the police sergeant's inquiry, Hall gave his name and said that the police could find him

1. Hall v. State, 223 Md. 158, 162 A.2d 751 (July 8, 1960).

2. Anno.Code of Md., 1957 Ed., Art. 27, secs. 645A–645J.

3. Hall v. Warden, 224 Md. 662, 168 A.2d 373 (March 10, 1961).

4. Hall v. Warden, 368 U.S. 867, 82 S.Ct. 78, 7 L.Ed.2d 65 (October 9, 1961).

5. Stenographic transcripts of these proceedings were made part of the record in support of the petition.

6. Hall v. Warden, 201 F.Supp. 639 (January 23, 1962).

at a certain tavern if they wanted to talk to him. He then left. The police sergeant and his lieutenant agreed that it would be well to get Hall in for further questioning and, although he was not at the place he had indicated, they located him at a tavern which had a name quite similar to the name of the tavern where he had said he could be found. As he saw two policemen enter the tavern, Hall said, "I knew youse were coming." He then said to the proprietress, "Mary, they think I did it." These remarks by Hall were made before any statement to him by the police officers or before any indication was given by them that he was a murder suspect. In fact, it does not appear that he was actually under suspicion until he made these statements.

Hall willingly accompanied the officers, at their request, to the Essex police station for investigation and questioning and they arrived there at approximately six thirty in the evening of July 16. Hall stated that he had recently come from New Jersey and was staying at the Ritz Hotel in Baltimore, but the officers ascertained that there was no such hotel in Baltimore and so informed Hall. Other discrepancies developed in his statements, but he made no incriminating admissions. The interrogation continued and shortly after midnight Hall agreed to go with the police and point out the hotel where he was actually staying. Following Hall's directions, two detectives drove him to the Edison Hotel in the City of Baltimore. En route Hall pointed out a restaurant where he had eaten on the day of the crime. He then said to the officers, "I am not going to show you any more. I have told you enough. I think I ought to see a lawyer." One of the officers responded, "That is your privilege," but the subject does not appear to have been further mentioned or pursued. Before they had reached the hotel, however, Hall said to the officers, "I would like to see a minister," to which one replied, "Sure." A few minutes later Hall said, "You fellows have been nice to me. I will show you where the apartment, where the hotel room is." When they arrived at the hotel the "evidence squad," which had been following in another car, went to the room, located and numbered as indicated by Hall, and searched it while Hall remained with the officers in the patrol car on the street below. While awaiting the result of the search Hall covered his face with his hands, started crying and said, "I am not afraid to die; I am afraid of going to Hell. They are going to find the clothes when they get up in the room." Hall was then asked if he was willing to tell the officers about it and he agreed, stating that if they would take him to a station he would tell them just what happened. The searching officers had found, under a chair in Hall's room, the cigar boxes containing money, checks and keys missing from the Gaff tavern. Hall was then taken to the Parkville Station and on the way he said, "I don't know why I did it. I don't know. I just don't know."

Beginning shortly before two o'clock on the morning of July 17, 1959, he was interrogated by Captain Adams of the Baltimore County Police, who had discussed the case with two of the detectives, and Hall made a long oral statement in which he admitted robbing the tavern, carrying a loaded gun, and binding and gagging Mrs. Gaff. He said that after taking the money he went to the bar, drank four or five shots of whiskey, noticed that Mrs. Gaff had gotten the gag loose and that she was "hollering" for help. In fact, he told in detail how he had entered the premises and what he had done up to the time of Mrs. Gaff's outcry. Hall said that he was not sure what happened then, "I must have killed her but I don't know." Detective Davis made longhand notes as Hall gave his statement and this questioning continued until approximately half past two o'clock. About an hour later a court reporter was brought in and Hall made a second statement. The interrogation was concluded at approximately 4:15 o'clock in the morning. During the periods of interrogation, Hall was provided with cigarettes, coca cola, coffee and perhaps

doughnuts. The following morning Hall conferred with an attorney employed by his father.

Following his indictment, Hall's jury trial began on November 9, 1959, during the course of which he took the stand for the purpose of testifying, out of the presence of the jury, concerning the voluntary nature of his confessions. His testimony at this point did not convince the trial court that the confessions and admissions were obtained from him by threats, promises or inducements and the oral confessions were permitted, over defense counsel's strenuous objection, to go to the jury. After the prosecution had rested its case defense attorneys, whose services were provided by members of Hall's family, called several witnesses to testify. Late in the evening, Hall was called to the witness stand but before he could begin his testimony court was adjourned until the next day. On the following morning, instead of recalling Hall as a witness in his own defense, his attorneys reconsidered the advisability of permitting him to testify and rested the case. Hall contends that this decision was arbitrarily made by his counsel, without his consent or acquiescence and contrary to his instructions.

We turn to the petitioner's brief for his statement of the questions which are submitted for our consideration on this appeal. They are as follows:

"1. Was the decision of the trial attorneys, that Hall should not testify in his own behalf, made without his consent or acquiescence?

"(a) If so, did Hall receive a constitutionally fair trial when, against his will, he was deprived of the right to testify in his own behalf?

"2. Was the confession voluntary?

"3. Did the State introduce evidence at the trial in 1959 which was the product of an illegal search?

"(a) If so, is the Doctrine of Mapp v. Ohio [7] retroactive to vitiate the conviction on constitutional grounds?"

1.

## ALLEGED DENIAL BY HALL'S COUNSEL OF OPPORTUNITY TO TESTIFY

We first note particularly that no oral testimony to support the allegations of the petition was offered before the District Judge although full opportunity to make such presentation was given. At the so-called hearing Hall and his counsel presented to the District Court nothing but a cold record consisting of typewritten transcripts of testimony and proceedings in courts of the State of Maryland. The District Court found, from this material so submitted, that "Hall acquiesced reluctantly in the decision of his counsel" that Hall should not testify at his trial in his own behalf.

We have examined the records and transcripts which were available to the District Court and which are a part of the record on appeal. It appears that, following his indictment, Hall was represented by two attorneys and he conferred with them on numerous occasions before commencement of his trial. He had frankly admitted to his counsel that he had entered and robbed the Gaff tavern on the night of the murder and that he bound and gagged Mrs. Gaff. He told them, in substance, the same story which he had given to the police officers. However, at all times during the conferences with counsel, he denied that he had stabbed Mrs. Gaff and insisted that she was alive when he left the tavern. Hall's counsel had discussed with him his manner of testifying so that his story might be presented in the most convincing manner, and it had been understood that he would testify in his own behalf. In fact, he was actually called to the witness stand but court was adjourned for the night before he had the opportunity to testify. The following morning, Mr. Sutton, one of Hall's two attorneys, went to the detention room some 25 or 30

7. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (decided June 19, 1961).

minutes before the trial proceedings were to be resumed and again discussed with Hall the manner in which he should testify in his own defense. While they were thus conferring Hall's other attorney, Mr. Daugherty, joined them and stated, in effect, that he had been thinking about this matter and had concluded that the introduction of the statements and confessions into evidence was error and that without them the State had failed to prove its case. After discussion with Hall and in his presence, both attorneys agreed that it would be a mistake to permit Hall to testify and tell the same story which they had concluded was then erroneously before the jury through the introduction of the confessions. Hall was aware of their decision and their reasons therefor.

8. The following questions and answers are from the transcript of Hall's testimony:
   "Q. And what did Mr. Daugherty say when he came in?
   "A. He came in, he says, you're not going to testify, so I asked him why, because it was all agreed that I was going to testify and he told me, he says, well, he says, I just don't think it will do you any good; the prosecutor might, in some way, trip you up and I told him, I asked him, I said, well, he can't trip me up, I says, if I tell nothing but the truth. He says, well, I don't think you should testify, and so the last word that was spoken before they left was, I said, well, I said, you guys are attorneys. I said, I don't know the law, I said, but I want to tell my side of the story and they went out.
   "Q. Now, when they went out, did you understand that you were not going to take the stand and testify in your own defense?
   "A. No, I didn't. It was—I couldn't understand whether I was or wasn't. I was still under the opinion myself that I was going to testify as we had planned."

9. The following is taken from the transcript of Mr. Sutton's testimony:
   "A. * * * Now about that time Bob [Daugherty] came in. Now, whether or not he had discussed it or not, prior to this, I don't know, but when he came in, he says 'Bill, I've decided not to put him on the stand, what do you think about it?'

At the Post Conviction Procedure hearing, Hall testified that he was "under the opinion," up to the time they returned to the court room, that he would be permitted to testify in his own defense.[8]

At the same hearing attorney Sutton was called as a witness. He told of his several conferences with Hall including the last conference held shortly before the trial was to resume.[9]

■ It is well settled that where the allegations of a petition for a writ of habeas corpus are denied, the burden is upon the petitioner to prove his allegations by a preponderance of the evidence. The District Judge found, in effect, that Hall had failed to carry the burden of proving that he was prevented from tes-

"THE COURT: * * * All right, what did you tell him?
   "A. Well, we—I don't remember the particular words. I just remember that then we discussed it back and forth as to the—what possible harm may occur as a result of his testimony, so we felt at that point of the trial that it was primarily circumstantial if we were successful in getting across the manner in which he obtained the—they obtained the statement, so we thought at that point they had failed to prove their case and we felt that perhaps it was the best for him not to testify.
   "Q. All right, now, what was Mr. Hall's reaction to this when you let him know that he was not going to testify?
   "A. When we discussed it with Mr. Hall, he still stated that he wanted to take the stand and I think we finally left it up—it was my impression that we left it up to his decision. Now, it was just a few minutes and we rushed out to—court had convened and I can't recall to this minute whether or not he agreed or disagreed.
   *      *   .    *        *         *
   "Q. And it is your testimony, as I understand it, then, Mr. Sutton, that after the discussion between you and Mr. Daugherty, that you can't say definitely whether Mr. Hall did or did not indicate his consent that he would not take the stand to testify, but you do know that he repeatedly said at this time that he wanted to tell his story to the jury?
   "A. That is true."

tifying by his own counsel, contrary to his stated wishes and. explicit instructions. As hereinbefore stated, the District Court found that Hall had reluctantly acquiesced in his counsel's decision.

Complaint is made before us that the District Court relied upon the conclusion of the State Court Judge, who heard and observed Hall and one of his attorneys as they testified, that Hall "merely yielded to the request of his attorneys and their advice that he stay off the stand." It is contended that there is no conflict whatsoever between the testimony of Hall and his attorney witness but it might be reasonably concluded from the record of Hall's testimony alone that the purport of his testimony was: "My attorneys explained to me, at my request, the reasons for their decision that I should not testify; I wanted to tell my side of the story but they, being lawyers, should ultimately decide the matter because they knew the law and I didn't; when we all left the detention room I didn't understand fully whether they had decided I was to testify or not but I was still under the *opinion myself* that I 'was going to testify as we had planned."

The testimony of Hall's attorney was quite vague, uncertain and less than convincing. He was able to recall that Hall had insisted during their several conferences that he (Hall) should testify. He stated that he thought the decision was left to Hall but he could not recall the last words spoken by Hall before they returned to the court room and he could not *remember* what decision Hall had reached. Strange it is, indeed, that upon entering the court room immediately following their conference and without hesitation counsel announced in open court, in Hall's presence, that they rested the case for the defense.

It has long been a well-recognized and accepted principle that the appraisal of the value and weight of the testimony of a witness is to be based not only upon consideration of his spoken word but also upon observation of his manner of testifying, his demeanor on the witness stand, his gestures, his inflections, his frankness or evasiveness, his intelligence and the reasonableness of his statements. Finders of fact, juries and judges, see and hear witnesses and apply, inter alia, the same principles. The District Judge welcomed an opportunity to hear and observe the witnesses and granted a hearing for that purpose. Instead, he was referred to pages of testimony and was restricted to a consideration of typewritten words. It is small wonder then that he attached significance to the finding of the State Court Judge who had heard and observed the witnesses as they testified before him and who determined that Hall had acquiesced in the decision of his counsel. We cannot say that the District Court's finding that Hall reluctantly acquiesced in his counsel's decision should be set aside as "clearly erroneous." [10] Having made that finding, the District Judge did not, nor do we, reach Hall's further contention that his constitutional rights were violated by his counsel's alleged arbitrary and unauthorized action.

### 2.

### WAS THE CONFESSION VOLUNTARY?

Perhaps this question might be amplified and stated as follows: Were Hall's confessions, damaging statements and admissions voluntary?

The trial judges and the jury found the confessions, statements and admissions to have been voluntarily made. The Court of Appeals of Maryland, after considering and discussing the claims that the confessions were involuntary and were improperly admitted in evidence, concluded: "We find no basis for overturning the ruling of the trial court in admitting the confessions in evidence or for concluding that the jury could not have properly found that they were made voluntarily and were obtained without the use of force or violence, threats or

10. See Rule 52(a), Federal Rules of Civil Procedure.

coercion (physical or mental) and without holding out or offering any inducements or promises therefor." 223 Md. 158, 172, 162 A.2d 751, 759.

At the hearing under the Post Conviction Procedure Act, Hall was contending that he had been held incommunicado, had been denied counsel, had been denied access to a minister, and that evidence obtained by an unlawful search was used by the police in their effort to obtain the coerced or involuntary confession. The judge before whom that hearing was held referred to the fact that the issue as to the voluntariness of the admissions and confessions had been determined adversely to Hall by the Maryland Court of Appeals and stated: "Having considered all the circumstances of this case, it is held that there is no showing of a violation of due process."

The District Court, under the heading "Voluntariness of the Confession," reported in 201 F.Supp. 639, 645–646, undertook to make its own independent determination of the question. After discussing the pertinent evidence, that court concluded:

"No material seized in the hotel room was used to obtain the confession from him, although Hall must have realized what the police probably had found in his room. Only after he had made his first admissions, and after his confession had been taken down in question and answer form by a stenographer, was he asked to identify the clothes, cash and checks which were seized at the hotel.

"After considering all of the points and arguments made by counsel for petitioner, I conclude that the oral confession and other admissions were voluntarily made and that their admission in evidence did not deny petitioner any constitutional right."

The evidence concerning the time when disclosure was made to Hall, or in his presence, of articles found in the hotel room is far from clear. One police officer, who was waiting in the car with Hall while the search was being conducted, testified:

"Q. Then what is the next thing that happened?

"A. After that we were informed by the Evidence Squad that certain evidence had been found in the room rented by Mr. Hall at the new Edison Hotel. At that time Leonard Hall stated, 'If you will take me to a Station, I will tell you all about it.' We informed our radio headquarters, Sergeant Rush was on the radio at the time, to have car 6 occupied by Captain Adams to meet us at the Parkville Station."

This testimony might well support the inference that Hall made his offer to tell all after the report was made in his presence as to the articles found in his room.

The district judge found that Hall was not shown or asked to identify the articles discovered in his room until after he had made his statement at the police station. But, as shown, Hall made other damaging statements while the search was being conducted and on the return trip to the police station which were received in evidence.

We reach the ultimate conclusion, as hereinafter stated, that the State of Maryland must be accorded an opportunity to retry Hall because of the admission in evidence of the articles found as the result of an unlawful search of Hall's hotel room. We can do no more than speculate as to what testimony will be offered at a retrial as bearing upon the voluntariness of the incriminating statements, admissions and confessions. We may assume that the evidence will follow the same general pattern as in the first trial, but we may assume further that the testimony concerning the circumstances of the disclosure to Hall of the results of the search will be more specific. Thus, we do not affirmatively find that error was committed but we shall call attention to certain principles which should serve as a guide upon a retrial.

■ It seems clear from the present record that before the commencement of the search Hall made no damaging statements or admissions, that during the course of the search he began to waver and that after the search was concluded he revealed to the police his activities at the tavern on the night of the murder. In determining whether incriminating statements, confessions and admissions are voluntary, the circumstances of pressure must be weighed against the power of resistance of the person confessing. This is true also upon appellate review where the *undisputed* portions of the record will be examined to ascertain the facts against which a claim of coercion must be measured. See Thomas v. Arizona, 356 U.S. 390, 393, 78 S.Ct. 885, 2 L.Ed.2d 863 (1958). In Takahashi v. United States, 143 F.2d 118, 122 (9th Cir., 1944), it is stated as follows:

"But, if it be established that there was an unlawful seizure of these documents, all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391, 40 S.Ct. 182, 64 L.Ed. 319, * * *."

■ In Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the Court held, in effect, that not only are the physical objects unlawfully seized inadmissible but no advantage shall accrue to the Government from the search. At a retrial, the trial court and the jury should make the further inquiry and determination whether the unlawful search, even before it had been concluded or the results thereof made known to Hall, affected Hall's power of resistance. It may be that Hall's incriminating statements were induced by the search which Hall must have realized the police were determined to make without bothering to ask his permission and which he must have known, as the District Court stated, would disclose damaging evidence. The

psychological effect on Hall produced by this search, which we later hold to be illegal, is a factor to be considered. See Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690, 694–695 (1940), opinion by Associate Justice Vinson, later Chief Justice of the Supreme Court of the United States; In re Oryell, 28 F.2d 639 (D.C.W.D.N.Y.1928), and United States v. Setaro, 37 F.2d 134 (D.C.Conn.1930).

### 3.

### DID THE STATE INTRODUCE EVIDENCE AT THE TRIAL IN 1959 WHICH WAS THE PRODUCT OF AN ILLEGAL SEARCH?

(a) IF SO, IS THE DOCTRINE OF MAPP V. OHIO RETROACTIVE TO VITIATE THE CONVICTION ON CONSTITUTIONAL GROUNDS?

Admitted in evidence at the trial without objection were the articles found by the police officers in their search without a warrant of Hall's hotel room. As stated by the District Court, at the time of Hall's trial and at the time his conviction was affirmed on appeal, the Maryland law sanctioned the admission in evidence in *felony* cases of material seized by state officers in an unlawful search, but prohibited its admission in most misdemeanor cases.[11] In this court Hall agrees, as stated in his brief, that "Maryland law at the time of the trial permitted the introduction of evidence in felony cases no matter how illegal was the search."

For many years the courts of the United States have concerned themselves with the protection afforded by the Fourth Amendment to the Constitution of the United States against unreasonable searches and seizures and against the use, for prosecution purposes, of evidence found and seized during such searches. In considering Hall's contention that his constitutional rights were violated, we turn to certain pertinent court decisions and, in doing so, it is to be kept in mind that Hall is a prisoner of

11. 201 F.Supp. 639, 642 (1962).

the State of Maryland who stands convicted under the laws of that State of a crime against the State.

In Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), it was held that in a *federal* prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure by federal officers although it was further held that articles unlawfully seized by local police officers acting on their own account were admissible in evidence.[12] This holding in Weeks was the first such decision by the Supreme Court of the United States.[13] Since the Weeks decision the Supreme Court has required of federal law officers "a strict adherence to that command which this Court has held to be a clear, specific, and constitutionally required * * * deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to 'a form of words.' "[14]

In 1949, thirty-five years after Weeks, the Supreme Court decided Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L. Ed. 1782, which involved a prosecution in a *state* court for a *state* crime. Evidence had been admitted at the trial which was obtained by state officers under circumstances which would have rendered it inadmissible in a prosecution for violation of a federal law in a court of the United States. The Supreme Court discussed the effect of the Fourth Amendment upon the states through the operation of the Due Process Clause of the Fourteenth Amendment, stoutly adhered to and reaffirmed the Weeks decision and determined that the Weeks exclusionary rule would not be imposed upon the states as an essential ingredient of the right to the security of one's privacy against arbitrary intrusion by the police. At 338 U.S. 25, 31, 69 S.Ct. 1359, 1362, the Court stated: "Granting that in practice the

exclusion of evidence may be an effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective." Although interpreting the *Fourth* Amendment as forbidding the admission of such evidence, the Court flatly stated: "We hold, therefore, that in a prosecution in a State court for a State crime the *Fourteenth* Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure." (Emphasis supplied.) 338 U.S. 25, 33, 69 S.Ct. 1359, 1364.

And so the law remained following Wolf v. Colorado (1949), supra, until the case of Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081, was decided on June 19, 1961. The Court there held that the exclusionary doctrine of Weeks was applicable in state as well as federal prosecutions.

In the period intervening between the Wolf and Mapp decisions, the Supreme Court had occasions to reconsider the holding in Wolf. In Irvine v. California, 347 U.S. 128, at page 134, 74 S.Ct. 381, at page 384, 98 L.Ed. 561 (1954), Mr. Justice Jackson announced the judgment of the Court [15] and said:

"* * * Never until June of 1949 did this Court hold the basic search-and-seizure prohibition in any way applicable to the states under the Fourteenth Amendment. At that time, as we pointed out, thirty-one states were not following the federal rule excluding illegally obtained evidence, while sixteen were in agreement with it. Now that the Wolf doctrine is known to them, state courts may wish further to reconsid-

---

12. See Mr. Justice Stewart's interpretation of Weeks in Elkins v. United States, 364 U.S. 206, 210, 80 S.Ct. 1437, 4 L. Ed.2d 1669 (1960).

13. See Wolf v. Colorado, 338 U.S. 25, 28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

14. See Mapp v. Ohio, 367 U.S. 643, 648, 81 S.Ct. 1684, 1688, 6 L.Ed.2d 1081 (1961).

15. Mr. Justice Jackson was joined in his opinion by the Chief Justice, Mr. Justice Reed and Mr. Justice Minton.

er their *evidentiary rules*. But to upset state convictions even before the states have had adequate opportunity to adopt or reject the rule would be an unwarranted use of federal power. The chief burden of administering criminal justice rests upon state courts. To impose upon them the hazard of federal reversal for noncompliance with standards as to which this Court and its members have been so inconstant and inconsistent would not be justified. We adhere to Wolf as stating the law of search-and-seizure cases and decline to introduce vague and subjective distinctions." (Emphasis supplied.)

In Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081, Mr. Justice Clark, writing for the Court, noted the fact that at "Term after Term" the plea had been made that the Court overturn its doctrine on applicability of the Weeks exclusionary rule in state prosecutions (page 654, 81 S.Ct. page 1691) and directed attention to certain decisions in which Wolf was discussed. However, the Wolf doctrine remained undisturbed and controlling until the decision in Mapp wherein the Court stated, 367 U.S. 654–655, 81 S.Ct. 1691:

"* * * Today we once again examine Wolf's *constitutional documentation* of the right to privacy free from unreasonable state intrusion, and, after *its* dozen years on our books, are led by *it* to close the only courtroom door remaining open to evidence secured by official lawlessness in flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that very same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." (Emphasis supplied.)

In Mapp, police of the City of Cleveland, Ohio, without a search warrant, visited the defendant's home and, after being denied admittance, gained entry through the use of force, searched the premises, found and seized obscene materials which were introduced in evidence against the defendant at her State trial which resulted in her conviction. Timely objections to the admission in evidence of the seized materials were made. The State of Ohio took the position that even if the search were made without authority, or otherwise unreasonably, it was not prevented from using the unconstitutionally seized evidence at trial and relied on Wolf v. Colorado, supra.

At Hall's trial no objection was made when the articles discovered and seized during the search of his hotel room were offered and admitted in evidence. On this appeal Hall's counsel speculates and suggests that the failure to object to the introduction of this evidence at the trial may be explained as follows: Any objection to the evidence would have been summarily overruled under the Maryland rule then prevailing and it would be "regarded as poor trial tactics to make continued objections before the jury and be overruled by the judge with an accompanying lecture on basic rules of evidence." Whatever may have been the reason for the failure to object, the fact remains that no question as to the legality of the search was raised by Hall either at his trial or on appeal from his conviction, nor was objection made to the use of the fruits of the search at the trial or on appeal. The legality of the search was challenged for the first time in the postconviction proceeding in the state court but Hall did not testify with respect thereto and submitted the point on the record prepared for the original appeal to the Court of Appeals of Maryland just as he elected to do before the District Court in this proceeding. In this respect the instant case is distinguishable from Mapp v. Ohio where timely objections to the use of the illegally obtained evidence were interposed and were vigorously pursued on appeal to the Supreme Court of Ohio, 170 Ohio St. 427, 166 N.E.2d 387 and in the Supreme Court of the United States.

In the case at bar, the District Judge noted that the Court of Appeals of Mary-

land, in the postconviction proceeding, said that the right to challenge the legality of the search and the use of the fruits thereof was *waived* by Hall through his failure to raise the question either at his trial or on appeal and that the Maryland Court was not expressing or implying any opinion as to the legality of the search and seizure there complained of.[16] However, the District Judge stated that, if it appeared from the record that the search was in fact illegal, he would be loath to hold that Hall had forfeited his constitutional claim and, therefore, the Judge should examine the question of the legality of the search. 201 F.Supp. 639, 644. He stated the following conclusions: Since there was no search warrant and the search was not made incident to Hall's arrest, the search, to have been lawful, must have been made with Hall's consent; ordinarily the burden of proof on the issue of consent is on the prosecution; the highest court of Maryland held that Hall waived his right to challenge legality of the search and Hall must show, by demonstrating that the search was illegal, that this ruling violated his constitutional rights; upon a review of the evidence Hall has not shown that the search was illegal; no strong reasons or special circumstances exist here to prevent the application of the general rule stated in Whitley v. Steiner [17] that Hall has forfeited his right to challenge the search.

■ As observed by the District Court [18] the general rule, as stated by this court in Whitley v. Steiner, 293 F.2d 895, 898–899, after a re-examination of all relevant Supreme Court cases, is that " * * * where a state prisoner, asserting a denial of constitutional rights in connection with his conviction, has a remedy in the state court but fails to avail himself of it, and later finds himself without a state remedy, he may not have redress through federal habeas corpus. * * * Under such circumstances the petitioner has, to utilize what is probably the most appropriate legal doctrine, 'forfeited' his constitutional claim." However, in the same case this court, speaking through Chief Judge Sobeloff, recognized a number of exceptions to the stated general rule including, inter alia, "where the petitioner can present other strong reasons justifying his failure; or finally, where there exist particular circumstances which are deemed to justify federal action." 293 F.2d 895, 899–900. We must, then, first determine whether the search was illegal.

In considering the legality of the search, the District Court correctly stated that, absent Hall's consent, the search was illegal. But there was no finding that Hall gave his consent, either express or implied. The court below found that Hall failed to discharge his obligation to show that the search was illegal and, further, in the absence of special circumstances, Hall had forfeited his right to challenge the search under authority of Whitley v. Steiner, supra.

■■ Again we turn to the record and we conclude that the search was, in fact, illegal. A person's hotel room is protected against unreasonable search.[19] It cannot be contended that a search under the conditions present here was made in Hall's presence or incident to Hall's lawful arrest.[20] In fact, Hall was voluntarily accompanying the officers and was then under investigation but he had not been placed under arrest. There is no showing of urgency, or that an immediate search might have been justified by a possibility that anything in Hall's room would disappear. On the contrary, it would have been a simple matter to post a guard at the hotel room door and attempt

16. Hall v. Warden, 201 F.Supp. 639, 643 (D.C.Md.); Hall v. Warden, 224 Md. 662, 664, 168 A.2d 373.

17. 293 F.2d 895 (4th Cir., 1961).

18. 201 F.Supp. 639, 643.

19. United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

20. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958).

to obtain a lawful warrant. Merely showing the officers the location of the hotel and telling them the number of his room are not sufficient to support a finding of Hall's consent to the search. It seems clear that his consent was not requested and the police were obviously no more concerned with obtaining consent than they were when, earlier that evening, in Hall's absence and without his knowledge or permission, they had ransacked his automobile. These police officers were fully aware that they were investigating a felony and it must be presumed that they were familiar with Maryland law and knew that any evidence found by them would be admissible no matter how it was obtained. The record would not support a determination that consent to search Hall's room could be implied from his conduct and from his failure to expressly object.

How then, is the decision in Mapp v. Ohio [21] to be interpreted and applied? Is it retrospective in effect or is it prospective only? It was handed down after Maryland's judgment of conviction had become final, the state relying upon the doctrine of Wolf v. Colorado, supra, and before that doctrine was repudiated and overruled by Mapp.

The Supreme Court, in the majority opinion, did not explicitly state that Mapp should apply either retrospectively or prospectively. The District Court observed in 201 F.Supp. 639 at 643: "Until the Supreme Court itself clarifies the point, it is impossible for any other court or judge to be certain whether and to what extent the Supreme Court intended the decision in Mapp v. Ohio to be retrospective." We agree. The District Court concluded that, in view of the frequent use in Mapp of such words as "then," "today" and "no longer" and the reasons given for the Supreme Court's previous refusal to impose the Weeks exclusionary rule on the states, Mapp was not intended to require that a new trial or release must be granted in the instant case where the point was not raised at the trial and the judgment had become final before Mapp was decided.

However, Mr. Justice Harlan in a dissenting opinion in Mapp, 367 U.S. at 676, 81 S.Ct. at 1703, after observing that during the "last three Terms" the issue of the inadmissibility of illegally state-obtained evidence had appeared on an average of fifteen times per Term in the *in forma pauperis* cases which had been summarily disposed of, said: "This would indicate both that the issue which is now being decided may well have untoward practical ramifications respecting state cases long since disposed of in reliance on Wolf * * *." Thus it appears that Mr. Justice Harlan, who was joined by Mr. Justice Frankfurter and Mr. Justice Whittaker in his dissent, considered the Mapp decision to be retrospectively operative upon ended state criminal cases. We are not unmindful of footnote 9 to the majority opinion (367 U.S. 659, 81 S.Ct. 1693) as follows: "As is always the case, however, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected." This footnote serves to remind us that the Court of Appeals of Maryland held that Hall had waived his right to challenge the legality of the search through his failure to follow the state procedural requirement that such challenge must be asserted at the trial or on appeal and this holding is to be considered if Mapp should be determined to be retrospectively operative.

It is possible to present arguments either for or against the retrospective application of Mapp. For example, it is clear that there was a wide divergence of opinion among the Justices of the Supreme Court who participated in the decisions during the periods following Weeks and Wolf and prior to Mapp. But it seems to us that the majority during that period viewed the question of admissibility of evidence obtained as the result of an unreasonable search as one

21. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

concerned primarily with the practical consequences of the application of formulated *rules of evidence* and by considerations of state and federal relations. The Supreme Court declared unconstitutional the use in *federal* prosecutions of evidence illegally obtained by *federal* officers but declined repeatedly to interfere with the states in their adoption of *rules concerning the introduction of evidence in state courts* in criminal prosecutions. Thus it might be said that the states had been led to believe that, prior to Mapp, they had definite assurance of federal non-intervention in this area. But the decision in Mapp scotched all notion that only *evidentiary rules* were involved. The majority held that this was a constitutional question and had been all along even though not so recognized by a majority of the Court; that the *Fourteenth Amendment* is a bar to the use by the states of evidence illegally obtained. Surely, in the minds of those who had sought to find some semblance of logic in a rule which recognized that, under the Constitution, evidence could be illegally seized and yet used to restrain the liberty or take the life of one whose constitutional guarantees were violated by the original unlawful actions of the State, the decision in Mapp was long overdue.

It must be recognized that, since Weeks and Wolf, there had been no change in the constitutional requirements of due process considered and found controlling in Mapp. If the protections are there now, were they not present when Wolf was decided and were they not present when Hall was tried, convicted and sentenced? An affirmative answer would appear to be inescapable.

It has been held that where a conviction is not final because of an appeal pending at the time Mapp was decided, the conviction must be reversed and the exclusionary rule of Mapp applied at the retrial.[22] There the State argued that past constitutional infringements should be ignored but the Court rejected this reasoning where the appeal was still pending, even though the conduct of the trial was proper under the law as laid down at that time. In People v. Figueroa, 220 N.Y.S.2d 131, a New York City Court found persuasive indication in the Mapp opinion that the Court intended to impose the rule prospectively and not retroactively, just as did the District Court in the instant case.

However, we note that the Supreme Court did not limit Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), to prospective operation although Mr. Justice Frankfurter, concurring in the judgment, urged that the Court should do so (pp. 25–26, 76 S.Ct. p. 593–594). In Eskridge v. Washington State Board of Prison Terms and Paroles, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 decided in 1958, the Supreme Court applied the rule announced in Griffin, supra, to a state conviction obtained in *1935*.

It might be argued that a retroactive application of the Mapp rule will flood the courts with petitions from prisoners long since tried and convicted by the use of illegally seized evidence. If such is the result of enlightened opinion, so be it. Such fears have not deterred the courts before.[23] It may be cogently argued further that if certain evidence is today in-

**22.** People v. Loria, 10 N.Y.2d 368, 223 N.Y.S.2d 462, 179 N.E.2d 478. The District Court cited this case and referred also to a Maryland case, Shorey v. State, 227 Md. 385, at 389, 177 A.2d 245, at 247 (Jan. 23, 1962). In the Shorey case, the Court of Appeals of Maryland said (p. 389, 177 A.2d p. 247): "The majority opinion in the Mapp case seems to recognize * * * that State procedural requirements to raise or preserve the ques-

tion may still be respected, even where it is claimed that the Fourteenth Amendment is violated by the introduction of illegally obtained evidence in a State prosetion."

**23.** See Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Commonwealth of Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126 (1956).

admissible to convict an accused, so should yesterday's conviction, based on identical evidence, be set aside and a re-trial ordered where a person's life is at stake. Hall's conviction was affirmed and finalized before Mapp and for this tech-nicality in point of time the State argues that the courts should refuse relief to Hall. But is this conviction so impreg-nable to collateral attack that the law is justified in exacting the death penalty from Hall because his trial and appeal were pushed along while it is possible that others who may have obtained delays may be retried by a different yardstick?

For compelling reasons, a court may expressly declare that its decision shall be prospective only. We do not say that, in the absence of an *express* declaration, the same intent might not be clearly dis-closed in the court's opinion. The Dis-trict Court drew that conclusion from the use by Mr. Justice Clark of certain isolat-ed words in the Mapp majority opinion but we are not convinced that the Su-preme Court, in forcefully expounding the existing, though unenforced, consti-tutional protections afforded state pris-oners by the Fourteenth Amendment, in-tended its decision to sanction denial of relief in a case such as this.

The Court, in Mapp, commenting on what *should have been* the holding in Wolf, stated:

" * * * Therefore, in extending the substantive protections of due process to all constitutionally unrea-sonable searches—state or federal—it was logically and constitutionally necessary that the exclusion doctrine —an essential part of the right to privacy—be also insisted upon as an essential ingredient of the right newly recognized by the Wolf case. In short, the admission of the new constitutional right by Wolf could not consistently tolerate denial of its most important constitutional priv-ilege, namely, the exclusion of the ev-idence which an accused had been forced to give by reason of the un-lawful seizure. To hold otherwise is to grant the right but in reality to withhold its privilege and enjoy-ment. * * * " 367 U.S. 655, 656, 81 S.Ct. 1692.

It is significant that the Supreme Court did not specifically declare that the effect of its decision was to operate only in the future, as it might have done.

The final question to be considered and determined is whether there were spe-cial circumstances present in this case to bring it within the exception stated by this court in Whitley v. Steiner.[24]

Under Maryland law, objections at the trial to the admission of the evidence ob-tained as the result of the unlawful search would have been futile in the State court as Hall's counsel well knew. It may now appear to have been the wiser course to object to the introduction of this evidence and to follow the same pro-cedure as in Mapp v. Ohio. But we reit-erate that the Supreme Court had refus-ed, time after time and over a long pe-riod of years, to require of the states the adoption of the Weeks exclusionary rule. There was nothing in the history of the decisions to raise or encourage the hope that the Supreme Court might then be inclined to change the rule. In fact, in the Mapp case, it appears doubtful that counsel for the accused were relying par-ticularly on this point. Mr. Justice Har-lan voiced strenuous objection to the Court's consideration of this constitu-tional question since, in his opinion, it had not been fully briefed and argued. We conclude that, under these special cir-cumstances, the failure of Hall to object to the admission of the fruits of the il-legal search and to raise the question on appeal is not only understandable but ex-cusable. The State of Maryland is hard-ly in position to insist that this failure constituted a waiver or forfeiture of Hall's constitutional rights. It is incred-ible that Hall would consciously and will-ingly have surrendered such a right, which was undoubtedly violated, had he known then what he knows now. In

24. 293 F.2d 895.

Mapp, had the Court sustained the conviction, a modest penalty was involved. Here, a man's life hangs in the balance and, while that fact is not controlling, it is just another circumstance which may be considered along with the other exceptional and special circumstances in the case. Perhaps the District Court may have been somewhat reluctant to be the first to apply Mapp retroactively, but it appears now that unless it is so applied and Hall's case is the first to be decided on that ground, the decision—at least for him—will be the last.

Counsel for Hall does not insist that the granting of proper relief here requires Hall's release from State custody. It is suggested that the case be remanded to the District Court with instructions to afford Hall such relief as, in its discretion, "is consistent with harmonious state-federal relations." We conclude that the District Court should afford the State of Maryland a reasonable opportunity to retry the prisoner. In default of this, the District Court should order his release.[25] To that end, the case will be remanded for further proceedings consistent with the views herein expressed.

Reversed and remanded.

HAYNSWORTH, Circuit Judge (dissenting).

When this Court considers the sufficiency of evidence to support a particular finding of fact, differences within the Court in a particular case need not occasion dissents. When the difference arises repeatedly, however, it becomes appropriate to question whether the prescribed standard of review is being properly applied. If it is not, dissent may serve some useful purpose, though it would be fruitless if there was no more than an isolated difference in judgment as to the reasonableness of a particular inference to be drawn from the record of one case.

In several recent cases, I have recorded my disagreement with reversals upon factual questions when the findings below seemed to me to rest upon substantial evidence.[1] I do so again.

The District Judge found that Hall consented to the search of his room. In his opinion, he clearly stated the legality of the search was dependent upon Hall's consent. After considering evidentiary matters, he concluded that Hall had not shown the search to have been unlawful. He placed the burden of showing an absence of consent upon Hall because Hall, at the trial, had not objected to admission of the evidence seized in the course of the search. He thought, I think correctly, that Maryland's procedural rule that would foreclose subsequent consideration, when no objection was made at the time of trial to the receipt of the evidence, required Hall to show that the search was more than arguably unlawful. We would adopt a similar approach if a District Judge refused to consider an untimely objection. See Rule 41(e) of the Federal Rules of Criminal Procedure.

If, however, the Court were of the opinion that the burden of persuasion rested upon Maryland to show that Hall consented to the search, a remand for reconsideration of the factual question would be in order, but disregard of the finding would be unwarranted.

The District Court's finding that Hall consented to the search is an ultimate finding which rests upon substantial evidence.

Hall sought out the police. He invited their attention to him and encouraged their suspicion of him. Not under arrest, he went willingly to the police station to talk to them about the events of the night before. He volunteered to take them to his hotel, which he had misidentified. He did so at a time and under such circumstances that he must have known that the officers intended to search the

---

25. See Hobbs v. Pepersack, 301 F.2d 875 (4th Cir., 1962).

1. Mason v. Mathiasen Tanker Industries, Inc., 4 Cir., 298 F.2d 28; Davis v. State of North Carolina, 4 Cir., 310 F.2d 904; Gardner, as Adm'x, v. National Bulk Carriers, Inc., etc. et al., 4 Cir., 310 F.2d 284.

room as soon as they located it, and that they would carry through with their intention when he disclosed the location of the room to them. At least, a reasonable fact-finder might infer from all of the facts and circumstances that Hall from the beginning wanted to bare his breast, wished the incriminating evidence in his room discovered, and willingly took the officers to his room in furtherance of that purpose.

There is no need here to marshal all of the evidence which appears to support the finding. It is sufficiently revealed in the opinion of the District Judge [2] and in the opinion of the majority. It is sufficient in my opinion to warrant the finding that consent was implicit in Hall's conduct. If the District Judge might have found the facts the other way, it is not for us to intrude upon the fact-finder's prerogative to determine which of two permissible, but conflicting, inferences is the more reasonable.

For the reasons stated by Judge Thomsen in his opinion, I would affirm.

ALBERT V. BRYAN, Circuit Judge (dissenting).

With the District Judge I think the confession of the accused was altogether voluntary, free of force or favor. The evidence establishes with equal clarity that he consented to the search of his room. This also in effect was the conclusion of the District Court. The result is that the articles seized in the search were, in my view, admissible in evidence without question upon either State or Federal grounds. In these circumstances Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) obviously is without pertinence, and no resolution need be made of whether or not the decision is retrospective. As reversal is premised on the illegality of the search, I must dissent.

I would affirm on the opinion of the District Court, Hall v. Warden, 201 F. Supp. 639 (1962).