UNITED STATES of America
v.
John E. BURKE, Leo C. Burke and William E. Libby.

Cr. No. 63–35.

United States District Court
D. Massachusetts.

March 29, 1963.

---

17. Atlantic City Elec. Co. v. General Elec. Co., 2d Cir., 1962, 312 F.2d 236; Kansas City v. Federal Pac. Elec. Co., 310 F. 2d 271 (8th Cir., 1962).

W. Arthur Garrity, Jr., U. S. Atty., Stanislaw R. J. Suchecki, Asst. U. S. Atty., for United States.

Joseph F. Dee, Jr., and Paul T. Smith, Boston, Mass., for John and Leo Burke.

James C. Heigham, Boston, Mass., for Libby, court appointed.

CAFFREY, District Judge.

The defendants were indicted on January 16, 1963, in a two-count indictment which charges them with violation of 18 U.S.C.A. § 2114, mail robbery, and 18 U.S.C.A. § 371, conspiracy to rob the mails. Each defendant filed a motion to suppress on the ground of allegedly illegal seizure from John and Leo Burke of various articles of personal property in violation of the Fourth and Fifth Amendments. The motions were heard on February 13, 1963, at which time movants called as witnesses three Boston police officers and two United States postal inspectors. The Government called no witnesses.

I find and rule as follows: On December 26, 1962, Post Office Inspector Thomas E. Agnew, one of the inspectors assigned to this case, considered the defendant John E. Burke a suspect in a mail robbery which had occurred in Dorchester, Massachusetts, on December 20, and was engaged in investigating John Burke's background. Inspector Agnew was then in possession of information

that John Burke had worked in the Fields Corner Post Office from February to March 1962, that he was transferred to the Roxbury Post Office in March, and that he quit his Post Office job in July of 1962 for no good reason. Inspector Agnew knew that John Burke had done some letter-carrying, that he had formerly owned a mail carrier's uniform and that he had recently obtained a carrier's uniform. Inspector Agnew also knew that John Burke met the description of one of the holdup men given by the driver of the mail truck involved in the Dorchester robbery on December 20. No evidence was presented at the hearing indicating that on December 26 or December 27 Leo Burke was considered a suspect or was under investigation for the mail truck robbery by any Federal law enforcement official.

■ On December 26, 1962, Inspector Agnew who wanted to find John Burke and question him about the mail robbery was searching the Dorchester area for John. He was assisted in his search by three Boston police officers who knew and could identify John if found. About 11:-00 p. m. the police officers and Inspectors Agnew and Kelly went to John Burke's home at 99 Harvard Street, Dorchester. The policemen spoke to his wife who told them John was not there. The officers then proceeded to 174 Harvard Street where John Burke also maintained a room. This room was sometimes used by his brother, Leo Burke. Finding neither John nor Leo in the room at 174 Harvard Street, it was agreed that there was no need of the Post Office inspectors "hanging around any later," since the police officers' shift required them to work until 3:00 a. m., and that the inspectors would go home and the police officers would notify Inspector Agnew if they found John prior to 3:00 a. m. when they went off duty. At 2:30 a. m., December 27, the police officers returned to 174 Harvard Street. In response to persistent ringing of the doorbell, the landlady opened the door, advised the officers that John Burke was not in, and offered to let the officers inspect his room. They looked around the room, under the bed and in the closet for John Burke, did not find him, observed a postal uniform jacket, and left. Nothing was seized at this time. The police officers did not have a search warrant nor did they then have probable cause as to either Burke. Their examination of the room at 174 Harvard Street was an illegal search. Since Inspector Agnew already knew that John Burke had recently acquired a letter-carrier's uniform, no new evidence was discovered during this illegal search and the so-called "fruit of the poison tree" doctrine (see Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939) ) has no application to this 2:30 a. m. search.

■ As the officers were leaving 174 Harvard Street about 2:40 a. m., they observed a young man start to turn in the front walk who stopped when he saw the officers and began to run away. They apprehended the young man, who was under the influence of liquor, and he proved to be Leo Burke. He was arrested, taken in a cruiser to Police Headquarters, booked, searched, and sent to Boston City Jail. The search disclosed that he had in his pockets a wallet containing $118.00 and a bottle of pills. Neither counsel for the movants nor counsel for the Government saw fit to introduce into evidence the charge on which Leo Burke was booked. In the absence of as much as a scintilla of evidence then indicating probable cause to arrest Leo Burke on any charge connected with the mail robbery, the only conceivable justification for his then arrest by the Boston Police would be violation of Gen.Laws, Ch. 272, sec. 44, intoxication in a public place. However, there is no evidence before this Court on the basis of which a finding can now be made that Leo Burke was arrested for intoxication. In fact, the only testimony offered tends to negative intoxication as the grounds for arrest: Detective Cunningham testified that while he and Leo Burke were riding in the rear seat of the police cruiser immediately after the arrest, in answer to a question from Leo "What is this concerned with," he replied

"You are under suspicion of a mail robbery job in Dorchester." I rule that the arrest of Leo Burke without a warrant and without probable cause was illegal. Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Muniz v. Mehlman, 327 Mass. 353, 356, 99 N.E.2d 37 (1951).

After arrival at the police station Detective Cunningham telephoned Inspector Agnew at about 3:20 a. m. as agreed and told him that the brother of John Burke had been picked up, that he had $118.77 on his person, that he had been drinking quite heavily and that there was no point in Inspector Agnew's coming to the police station seeking to question Leo because he was then under the influence of liquor. I find that at about 9:30 a. m. December 27, Inspectors Agnew and John J. Sullivan questioned Leo Burke at Boston Police Headquarters and that prior to questioning Leo, Inspector Agnew fully and fairly advised him of his constitutional rights, including specific advice to the effect that the inspectors were investigating the Dorchester mail robbery, that Leo had a right not to talk to them, that he had a right not to answer any questions and that he had a right to counsel. I further find that Inspector Sullivan asked Leo if the inspectors could look at what he had in his pockets and Leo brought out a wallet and emptied it. Inspector Agnew told Leo "We are not trying to kid you about this" and that some of the bills taken in the mail robbery were marked. The inspectors, who observed markings on two of the $20 bills that Leo had taken out of his wallet, requested him to swap the two marked bills for two other $20 bills. I find that Inspector Agnew advised Leo that the marked bills could be identified by a Post Office Dispatch Clerk and that if Leo gave the bills to them they would be taken to the Dispatch Clerk for identification. Leo told them that he had received the bills in question from the Codman Square Bank the previous afternoon and voluntarily swapped the two $20 bills.

■■ I do not read the recent decision in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 409, 9 L.Ed.2d 441 (1963), or any other opinion of the Supreme Court, as ruling that as a matter of law a person who is illegally arrested is thereby rendered legally incapable of making any voluntary admission or any voluntary surrender of property on his person by reason of the illegal arrest. I believe that whether or not an admission or a surrender of property made after an illegal arrest is voluntary and therefore admissible in evidence, or involuntary and therefore inadmissible, is to be decided on a motion to suppress as a question of fact, (United States v. De Vivo, 190 F.Supp. 483, 486 (E.D.N.Y. 1961) ), in the resolution of which the trier of fact should have in mind the "oppressive circumstances" (Wong Sun v. United States, supra, at 486, n. 12 of 371 U.S., at 417 of 83 S.Ct.) surrounding the illegal arrest and should require clear and convincing evidence that the admission or surrender is the product of an intervening independent act of the defendant's free will.

■ I find as a fact that Leo Burke was fully advised of his rights by the Post Office Inspectors and that his conversation with them and the swap of the two $20 bills made by him subsequent to the illegal arrest was made deliberately and voluntarily on the basis of an intervening independent act of his own free will, and that they were not made under the compulsion of the illegal arrest.

■■ Nor is this evidence inadmissible under the doctrine of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) and the provisions of Rule 5(a) of the Federal Rules of Criminal Procedure requiring that a defendant shall be taken "without unnecessary delay before the nearest available commissioner," because the uncontradicted evidence is that Leo Burke was under the influence of liquor when arrested, to such an extent that the arresting officers advised Inspector Agnew at 3:30 a. m.

that he was not in proper condition, due to his heavy drinking, to be questioned. I do not read Mallory as requiring arraignment before a Commissioner of a person who is so under the influence of liquor as not to recognize the nature of the proceeding.

The motion to suppress is denied as to the two $20 bills received from Leo Burke by Inspector Sullivan and as to the conversation between Leo Burke and the Post Office inspectors at Boston Police Headquarters on the morning of December 27, 1962.

■ On January 4, 1963 Inspectors Agnew and Sullivan met John Burke at the Field Cafe on Blue Hill Avenue, Dorchester, where he was seated in a booth with friends. Inspector Agnew, after advising John of his rights, asked John if he would talk with them, and John stepped outside and entered an automobile with the inspectors. In the car Inspector Agnew again advised John of his right not to talk with them, of his right not to answer any questions, and of his right to counsel. The inspectors then advised John that they would like to see the carrier uniform. John said that they could and that it was at his home. The three drove to 99 Harvard Street, were led into the front bedroom by John who, after being advised of his right not "to show us this stuff" by Inspector Agnew, produced some articles of uniform including two pair of pants and a jacket. The inspectors requested and were granted permission to examine the pockets of the garments and Inspector Agnew, after advising John of his rights for a fourth time that day, patted the pockets of one of the carrier uniform pants and discovered two 45 caliber automatic live cartridges therein. The inspectors requested and were granted permission by John to take the jacket, pants and cartridges. There was no evidence offered indicating that the jacket ob-

served by the police at 174 Harvard Street at 2:30 a. m. December 27 was the same jacket voluntarily turned over by John Burke on January 4, 1963. Before leaving the premises the inspectors received a written authorization signed by John Burke which reads as follows:

"I, John E. Burke, invited Postal Inspectors Agnew and Sullivan into my apartment, 99 Harvard Street, Dorchester, in order for them to examine my letter carrier uniforms.

"I was advised by the Inspectors before coming to my apartment that I did not have to show them anything or let them in the apartment or even talk to them. They advised me I was a suspect in the robbery of a mail truck which occurred on December 20, 1962.

"I authorized the inspectors to look in my uniform pockets and also advised them they could take these uniforms with them if they wished.

"While looking through the watch pocket of the uniform pants, Inspector Agnew produced two 45 shells.

"I hereby authorize the inspectors to take the trousers and bullets with them. I have placed my initials and today's date in the trousers. I also authorize the inspectors to take my uniform jacket and cap. Signed: John E. Burke."

On the basis of the foregoing I find and rule that there was no illegal search or seizure at John Burke's home on January 4 because he voluntarily went with the officers from the cafe to his home, and because, after being fully advised of his rights, he voluntarily talked with the inspectors and turned over to them the articles described in his statement.

The motion to suppress is denied as to the conversations between John Burke and the Post Office inspectors on January 4, 1963, and as to the articles received by the inspectors on that date from John Burke.