STATE OF HAWAII *v.* GEORGE MORITO
KITASHIRO.

No. 4380.

DECEMBER 2, 1964.

TSUKIYAMA, C.J., CASSIDY, WIRTZ,
LEWIS AND MIZUHA, JJ.

OPINION OF LEWIS, J., IN WHICH WIRTZ, J., JOINS,
ANNOUNCING THE JUDGMENT OF THE COURT.

This is an appeal by George Morito Kitashiro, one of
two codefendants charged with larceny first degree, *i.e.*,
the theft of an automobile belonging to Theodore T.

Kawamura, Jr. The other defendant, Kenny Yukuo Otake, changed his plea from "not guilty" to "guilty" by permission of the court after the State had put in its case. Kitashiro, hereinafter referred to as "defendant," was convicted after trial jury-waived, and upon the entry of judgment appealed therefrom, his ground of appeal being, as set forth in the specification of errors, the admission into evidence of his confession after the court had deferred to the time of trial a ruling on defendant's pre-trial motion to suppress it, which was renewed at the trial and denied at the conclusion of the trial.

Defendant contends that his confession was the product of an unlawful search and seizure, an unlawful arrest, and an unlawful delay between his arrest and production before a magistrate,[1] each of which *ipso facto* requires the exclusion of the confession from evidence, according to defendant's argument.

The trial court found that an illegal search and seizure had occurred. The legality of the search and seizure is not before us. However, the State contends that the confession was not tainted by the illegal search and seizure. This was but one of the surrounding circumstances having to do with the ultimate question of voluntariness, likewise the lawfulness or unlawfulness of defendant's arrest and detention were only circumstances bearing on the ultimate question of voluntariness, according to the State's contention.

The evidence showed that Kawamura's car was stolen on November 13, 1962, and recovered the next morning at 9:15 A.M. at which time it had been stripped of many parts and was inoperable.

---

[1] Defendant also asserts that his confession was the product of a chain of events set off by the unlawful arrest of one *M*, who thereafter informed against him. The State contends that it does not lie with defendant to assert the unlawfulness of this person's arrest. We do not reach this question.

It so happened that Kawamura himself came upon vital information on the morning his car was recovered. While delivering laundry in pursuit of his business, he noticed a group of youths at a residence next door to his customer's, one of whom was carrying a transmission from the trunk of a car. Kawamura went over, talked to the youths, and watched one of them, Otake, cleaning the transmission. While there he recognized, among the things they had, a dilapidated pink chenille bedspread which he customarily carried in the stolen car and used to cover the floor of the car to protect his customers' clothes. He went back to his shop and summoned police aid. When he got back to his shop he learned that his car had been found and towed in.

Returning to the scene with the police he found Otake still cleaning the transmission in the driveway. Upon questioning by the police Otake admitted the transmission was stolen. At this time Kawamura saw there some dresses his wife had been making, which had been in the stolen car.

While the police were at Otake's residence a car drove up containing two juveniles besides the driver. Otake had implicated one "Smokey," who turned out to be the driver. One of the juvenile passengers implicated defendant. This informer, whom we have referred to as *"M,"*[2] took the police to defendant's residence and to where his car was parked on the University campus. At both places, according to the trial court's holding, there occurred illegal searches and seizures of automobile parts stripped from Kawamura's automobile. Prior to the trial, on defendant's motion, the court suppressed the use as evidence of any of the automobile parts so recovered. See H. R. Cr. P., Rule 41 (e).

After recovering the stolen parts from defendant's

---

[2] See footnote 1.

residence and parked car the police waited for him to return home. They had asked to be informed when he returned. When defendant's parents called and said he was back, the police again went to his residence about 3:00 P.M. Defendant's father was there and asked for some time alone with his son. The police waited in the garage and arrested defendant after the conclusion of his talk with his father. There was no warrant for his arrest and defendant contends it was unlawful. The basis for this contention is the alleged unreliability of the information obtained from *"M,"* and the illegality of the searches and seizures made by the police. However, for reasons hereinafter stated, we do not find it necessary to pass on the lawfulness of the arrest.

After defendant's arrest at his home he was taken to the police station in a car containing two police officers, one of whom could not recall whether anything was mentioned to defendant at the time about the automobile parts. The other, Officer Ragsdale, testified as to the conversation on the way to the police station:

"Q. In your conversation with George, did you mention the fact that you had taken certain automobile parts from his home?

"A. I think I did.

"Q. Did you also tell him that since you had the parts, he might as well confess?

"A. Not that way. I told him I had the parts— 'You may as well tell the truth as to what happened'— because at the time he was very quiet. I asked him a question and he didn't say anything; so I just said, 'Let's tell the truth. What happened?'

"Q. But you did mention the fact that you had the automobile parts?

"A. I imagine I did."

Defendant testified:

"Mr. Naito: Now, at the time of your arrest at your residence, did the officer mention anything to you about any automobile parts?

"Witness: Well, I heard someone say that 'we have the parts already.'

"Q. (By Mr. Naito) Did they tell you where they got the parts?

"A. Yes. From the garage closet.

"Q. And this—was this told to you?

"A. Yes, I think so.

"Q. Did the officer say anything about making a confession because he had the parts?

"A. While we were riding down to the police station.

\*  \*  \*  \*  \*  \*

"Q. Do you recall how many times he told you that they had the parts so you had to confess?

"A. Yes—no, I don't remember exactly how much, but they told me quite a few times.

"Q. They kept repeating it, is that correct?

(Witness nodding.)"

Defendant arrived at the police station at 3:15 or 3:30 P.M. and was booked, along with others. At this point Officer Kasparovitch of the Detective Bureau, to whom the case had been assigned, saw him for the first time. However, Officer Kasparovitch interrogated Otake before defendant, interrupting this interrogation briefly to arrest defendant for the second time and place him in another interrogation room. At that time, Officer Kasparovitch saw defendant's father as well as defendant. The father was with defendant in the interrogation room for ten or fifteen minutes. The father told defendant that on his lawyer's advice he should not say anything.

Defendant was not questioned until 7:10 in the evening. Meanwhile he remained in the interrogation room.

He saw other officers, who questioned him about another matter. He was not questioned about this case, and for nearly three hours waited there for Officer Kasparovitch.

According to Officer Kasparovitch, when he first went into the interrogation room where defendant was waiting the following occurred:

"* * * I asked him if he wanted to eat. He said no, he wanted to get it off his chest and continue. And I said, 'Did your father talk to you about your attorney not wanting you to say anything to me?' And he said, 'Yes, but I want to get it off my chest and I want to talk about it.' So I said, 'Okay, let me have your story.' "

Defendant then gave Officer Kasparovitch an oral statement, following which a stenographic statement was taken, commencing at 8:00 P.M. At approximately 8:30 P.M. defendant was taken to the cell block, the taking of the stenographic statement having been concluded. The next morning, at 8:00, Officer Kasparovitch took down to the prosecutor's office a complaint which had been typed out the night before. Defendant was permitted to leave the police station about noon.

Officer Kasparovitch testified that though he knew certain auto parts had been recovered at defendant's home he only questioned defendant about the parts he took and made no statement about the parts found at his residence. Defendant testified, to the contrary, that when Officer Kasparovitch came into the interrogation room: "He told me, 'Are you ready to confess?' He told me, 'You might as well. We have the parts.' " Defendant further testified:

"Q. Why did you say you were ready to confess?

"A. Because I felt that I wasn't—there wasn't anything I could do.

\*       \*       \*       \*       \*       \*

"Mr. Naito: Now, you stated that you confessed

because you felt that they had the parts; so you felt you might as well tell?

"Witness: Yes.

"Q. (By Mr. Naito) Now, was this the only basis for your confession?

"A. Yes."

## I

It is settled law in this jurisdiction that: "A confession otherwise shown to have been voluntary is not rendered inadmissible by the fact that its author was under arrest or in custody at the time, even though the arrest or custody may have been under invalid process or without any process or legal right." *Territory* v. *Young and Nozawa,* 37 Haw. 189, 197, *aff'd,* 163 F.2d 490 (9th Cir. 1947). Defendant contends that, under *Wong Sun* v. *United States,* 371 U.S. 471 (1963), this rule no longer obtains because the Fourth Amendment and the accompanying exclusionary rule apply to the states by virtue of the Fourteenth Amendment as held in *Mapp* v. *Ohio,* 367 U.S. 643, and under *Wong Sun,* "if there is an illegal arrest of a defendant, his confession which follows the illegal arrest is not admissible in evidence, even if the confession was *voluntarily* given," so it is argued.

Defendant's contention is without merit. As stated in *Wong Sun:* "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion," and "matters observed [or overheard] during an unlawful invasion * * *." *Wong Sun* extended this rule to "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case * * *." (371 U.S. at 485). In *Wong Sun,* federal officers without probable cause broke open a door and followed defendant into his living quarters, where he was placed under arrest and at that time

made oral statements held admissible by the courts below but held by the Supreme Court to be within the scope of the exclusionary rule. The decision rested on the oppressive circumstances there present.

The federal courts have had occasion to pass on the contention here made that a confession following an illegal arrest is *ipso facto* inadmissible under *Wong Sun*. Prior to that decision they followed the same rule as has been followed in Hawaii in a case of illegal arrest. The contention that *Wong Sun* has eliminated the question of voluntariness in such a case was rejected in *Rogers* v. *United States*, 330 F.2d 535, 540-42 (5th Cir.) ; *Hollingsworth* v. *United States*, 321 F.2d 342, 350-51 (10th Cir.) ; *Burke* v. *United States*, 328 F.2d 399, 402-03 (1st Cir.), *affirming* 215 F. Supp. 508, 511. But see *Gatlin* v. *United States*, 326 F.2d 666, 672 (D.C. Cir.). State cases decided since *Wong Sun* also apply the voluntariness test. *State* v. *Keating*, 61 Wash. 2d 452, 378 P.2d 703; *Prescoe* v. *State*, 231 Md. 486, 191 A.2d 226; *People* v. *Freeland*, 32 Cal. Rptr. 132.

Here the trial court found that even if one of the two arrests of defendant was illegal the other was not, and that defendant had decided to confess after talking to his father and after being told by his father to follow his lawyer's advice and say nothing. Defendant was not arrested, even on the first occasion, until after he had talked with his father. The oppressive circumstances present in *Wong Sun* are entirely lacking. As in *Rogers* v. *United States, supra*, 330 F.2d 535, there was approximately a three-hour interval between the arrest and the confession, during which defendant was not under interrogation and was free to assay his position. *Wong Sun* is inapplicable even if the arrest was unlawful, a point not decided.[3]

---

[3] A fortiori, the lawfulness of the arrest of *M*, the informer, need not be decided. See footnote 1.

Defendant cites *Bynum* v. *United States*, 104 App. D.C. 368, 262 F.2d 465, where a defendant who voluntarily came to the police station was arrested there without probable cause and his fingerprints taken. The court equated this to a search of the person on the occasion of an illegal arrest, governed by *United States* v. *Di Re*, 332 U.S. 581, or a statement obtained from an accused person during his illegal detention, governed by *Upshaw* v. *United States*, 335 U.S. 410 and *Mallory* v. *United States*, 354 U.S. 449. Since *Bynum* was a federal prosecution the court had no occasion to decide which of these two lines of authority it was following. In a state prosecution this must be decided since the second line of authority does not govern.

What has been referred to above as the second line of authority (*Upshaw* v. *United States, supra, Mallory* v. *United States, supra*) commonly is referred to as the *McNabb-Mallory* rule.[4] This court repeatedly has held that the *McNabb-Mallory* rule does not apply in the courts of this State. *Territory* v. *Aquino*, 43 Haw. 347, 368-76; *State* v. *Evans*, 45 Haw. 622, 635, 372 P.2d 365, 375; *State* v. *Shon*, 47 Haw. 158, 165-67, 385 P.2d 830, 835-36. The Court of Appeals for the Ninth Circuit so held in *Palakiko* v. *Harper*, 209 F.2d 75, 94. Defendant concedes that the *McNabb-Mallory* rule is without constitutional basis, unless *Wong Sun* anchored it on the Fourth Amendment. *Wong Sun* does not have that significance.

The *McNabb-Mallory* rule is a federal rule, based on the Supreme Court's supervisory powers over federal criminal prosecutions. It is confined to cases of unlawful delay between arrest and arraignment before a United States Commissioner. Under the rule a confession during such unlawful delay *ipso facto* is inadmissible. As seen,

---

4 This nomenclature refers to *McNabb* v. *United States*, 318 U.S. 332; *Mallory* v. *United States, supra*, 354 U.S. 449. The line of cases embraces *Upshaw* v. *United States, supra*, and many other cases.

the federal courts generally have declined to extend this rule to illegal arrest cases even after *Wong Sun*. Thus the rule retains its original supervisory character. If the rule had constitutional basis it surely would be applied to illegal arrest cases. To put it another way, if any success were to be scored by the champions of a rule excluding confessions made during illegal detention as a Fourth Amendment matter irrespective of voluntariness, the illegal arrest cases would be the first ones to feel the impact of the Fourth Amendment in this new area.

After this case was argued, *Escobedo* v. *Illinois*, 378 U.S. 478 (June 22, 1964), was decided. Escobedo, who had been arrested, interrogated and released pursuant to a writ of habeas corpus obtained by his lawyer, again was picked up about ten days later between 8:00 and 9:00 P.M., after he had been implicated by one subsequently made a codefendant. He was held in custody and interrogated, but repeatedly asked to see his lawyer. Finally, when confronted by his accuser, he implicated himself by saying "I didn't shoot Manuel, you did it," and thereafter made further admissions. His statement was taken by an assistant state attorney. Meanwhile, his retained lawyer repeatedly sought to see his client from 9:30 or 10:00 P.M. to approximately 1:00 A.M., but succeeded only in making his presence at the Homicide Bureau known at one point when a door to the office where defendant was held was open.

In an extension of *Massiah* v. *United States*, 377 U.S. 201 (May 18, 1964), the Court held in *Escobedo*:

"* * * The fact that many confessions are obtained during this period [between arrest and indictment] points up its critical nature as a 'stage when legal aid and advice' are surely needed. * * * (p. 488).

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"We hold, therefore, that where, as here, the in-

214

vestigation is no longer a general inquiry into an un-
solved crime but has begun to focus on a particular
suspect, the suspect has been taken into police custody,
the police carry out a process of interrogations that
lends itself to eliciting incriminating statements, the
suspect has requested and been denied an opportunity
to consult with his lawyer, and the police have not
effectively warned him of his absolute constitutional
right to remain silent, the accused has been denied
'the Assistance of Counsel' in violation of the Sixth
Amendment to the Constitution as 'made obligatory
upon the States by the Fourteenth Amendment,'
*Gideon* v. *Wainwright,* 372 U.S. [335], at 342, and
that no statement elicited by the police during the
interrogation may be used against him at a criminal
trial. (pp. 490-491).

\*     \*     \*     \*     \*     \*

"Nothing we have said today affects the powers
of the police to investigate 'an unsolved crime,' *Spano*
v. *New York,* 360 U.S. 315, 327 (Stewart, J., concur-
ring), by gathering information from witnesses and
by other 'proper investigative efforts.' *Haynes* v.
*Washington,* 373 U.S. 503, 519. We hold only that
when the process shifts from investigatory to accusa-
tory—when its focus is on the accused and its purpose
is to elicit a confession—our adversary system begins
to operate, and, under the circumstances here, the
accused must be permitted to consult with his lawyer."
(p. 492).

While *Escobedo* marks a shift in course, upon com-
parison with *Crooker* v. *California,* 357 U.S. 433, *Cicenia*
v. *Lagay,* 357 U.S. 504, *Culombe* v. *Connecticut,* 367 U.S.
568, and *Haynes* v. *Washington,* 373 U.S. 503, the point
pertinent here is that emphasis was put upon the right to
counsel. The *McNabb-Mallory* rule was not extended to

state cases. It remains the rule in this jurisdiction that a confession obtained during unlawful delay between arrest and production before a magistrate is not *ipso facto* inadmissible.

The adoption of Rule 5(a) of the Hawaii Rules of Criminal Procedure was not an adoption of the *McNabb-Mallory* rule by this court. This is evident from *State* v. *Shon, supra,* 47 Haw. 158, 165-67, 385 P.2d 830, 835-36. Paragraph (2) of Rule 5(a) qualifies the provision for taking a person arrested without a warrant before a magistrate by the language "except where and to the extent the detention of the arrested person is authorized by law." The quoted language is enough in itself to differentiate the rule from its counterpart in the Federal Rules of Criminal Procedure. The exception refers to and incorporates R.L.H. 1955, §§ 255-5 and 255-9, as does the reference later in the same paragraph of the rule to persons "arrested for examination." The significance of these statutory provisions was recognized in *Young and Nozawa* v. *Territory, supra,* 163 F.2d 490, 496, *affirming* 37 Haw. 189.

Defendant contends that "both arrests were arrests in the fullest sense and not arrests for investigatory purpose." However, irrespective of the lawfulness or unlawfulness of the arrests and subsequent detention, under the rule applicable in this jurisdiction it is decisive of this branch of the case that the confession plainly was voluntary[5] and there was no denial of the right to counsel.

---

[5] For purposes of this opinion, the question of voluntariness and the question whether the confession was tainted by the unlawful search and seizure have been considered as two separate points. However, in *Hall* v. *Warden,* 313 F.2d 483 (4th Cir.), the question whether the confession was tainted by the unlawful search and seizure was treated as a question of voluntariness. The cited case is discussed in Part II, *infra.* The validity of that treatment need not be pursued at this time. In any event, the question of the taint of an unlawful search and seizure brings into the case problems that are distinct from those presented by the alleged unlawful arrest and detention. Here the confession plainly was voluntary unless not deemed such because tainted by the unlawful search and seizure.

The crux of the case therefore lies in the remaining point. There is no disagreement on this among the members of the court, though one member so holds without joining in this Part I.

## II

Was the court's decision that unlawful searches and seizures had occurred sufficiently implemented by the court's rulings?[6] Under the Fourth Amendment as interpreted in the leading case of *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385, and under our own State Constitution, Article I, § 5, as interpreted in *State* v. *Pokini,* 45 Haw. 295, 308, 367 P.2d 499, 506, and *State* v. *Evans, supra,* 45 Haw. 622, 637, 372 P.2d 365, 374, there must be excluded from evidence not only articles illegally seized but also other evidence which is "a fruit of the poisonous tree."[7] This doctrine encompasses a confession which is tainted by an unlawful search and seizure. *Fahy* v. *Connecticut,* 375 U.S. 85, reversing on account of the admission of illegally seized evidence and noting that, since the case was tried prior to *Mapp* v. *Ohio,* 367 U.S. 643, the petitioner was unable to claim at the trial that the illegally seized evidence induced his admissions and confessions, the Court concluding "petitioner should have had a chance to show that his admissions were induced by being confronted with the illegally seized evidence"; *State* v. *Evans, supra,* 45 Haw. 622, 636-38, 372 P.2d 365, 374-75, recognizing applicability of the *Silverthorne* doctrine but finding the record insufficient to determine the point at issue; *People* v. *Rodriguez,* 11 N.Y.2d 279, 286,

---

[6] The court suppressed the automobile parts so seized and those portions of the confession referring to the stripping of the car and division of the parts among the participants in the crime. The question here is whether the confession should have been excluded altogether. We have no question before us as to the correctness of the court's ruling excluding portions of the confession.

[7] Quoted from *Nardone* v. *United States,* 308 U.S. 338, 341.

229 N.Y.S.2d 353, 357, 183 N.E.2d 651, 654, stating that "it matters not that these 'fruits' happen to be confessions rather than some other type of evidence," and that "if [defendant] was induced to confess as a result of being confronted with [illegally obtained] articles, his confession may not be received in evidence"; *Commonwealth* v. *Spofford,* 343 Mass. 703, 180 N.E.2d 673, suppressing photographs delivered by defendant to the police after questioning by the police on the basis of other similar material illegally obtained, the court holding: "The defendant's purported consent and the second lot were an offshoot of the original unreasonable search and seizure. Its acquisition was branded with the original taint." See *Takahashi* v. *United States,* 143 F.2d 118, 122 (9th Cir.), a similar case. *Cf., Hall* v. *Warden, supra,* 313 F.2d 483, 489-90 (4th Cir.), in which the court reversed because of the admission of illegally seized evidence, and treated the question of the tainting of the confession by the illegal search and seizure as one of voluntariness, dependent on "the circumstances of pressure." On the record as it stood, petitioner was not shown the articles illegally seized until after he had made his statement, but there was an inference that a report was made in his presence as to the finding of these articles before he made his statement. Since the case in any event was to be retried, the trial under review was before *Mapp* v. *Ohio, supra,* 367 U.S. 643, and upon retrial more specific testimony might be offered concerning the circumstances of the disclosure to petitioner of the results of the illegal search, the court did not affirmatively find that error was committed as to the confession but set out principles to serve as a guide upon retrial, stating:

> "* * * It may be that Hall's incriminating statements were induced by the search which Hall must have realized the police were determined to make

without bothering to ask his permission and which he must have known, as the District Court stated, would disclose damaging evidence."

Here it is undisputed that at the time of defendant's arrest, or shortly thereafter on the way to the police station, defendant was told that the police had the automobile parts and he might as well "tell the truth." Thus the illegally seized automobile parts were used to instill in defendant a realization of the hopelessness of his situation. He was left to meditate on it for about three hours, while the corrosive properties of the poison so instilled had their intended effect. We cannot agree with the State's contention that during this interval the taint of the illegal search and seizure became dissipated.

We must ask ourselves what induced defendant's confession. Defendant testified that it was because he felt there wasn't anything he could do. He directly attributed his confession to the police having the parts. He testified that while he was told others had confessed and had implicated him, this was not until after he had said he was ready to confess. Officer Kasparovitch, the interrogating officer, testified that at about 6:38 P.M., while interrogating Otake, he brought defendant Kitashiro in, and Otake identified him as the person who helped Otake strip the car. However, on objection by Kitashiro's counsel to the admission of this evidence against him, it was confined to Otake's case, this being prior to Otake's change of plea. Therefore, we cannot consider this evidence in connection with the case before us.

Some evidence was required to rebut the natural and reasonable inference that the statement made by the police concerning the stolen parts taken from defendant's home had the intended effect on defendant and did induce his confession as testified by him. While the trial court ruled that "I don't believe the defendant when he said that he

confessed because they had the goods," defendant's contention did not rest on his credibility alone. Nor did it rest upon rejection of Kasparovitch's testimony that he made no statement to defendant about the parts found at his residence. Defendant's contention had a solid foundation in undisputed fact, consisting in statements made to defendant by Officer Ragsdale, who took him to the police station.[8] The prosecution offered no rebutting evidence, other than what Otake said in Kitashiro's presence and that was not offered on the point under consideration and was excluded, as we have said. The case therefore is one in which the prosecution did not meet its burden of going forward with the evidence.

The rule we must follow as to the burden of proof was laid down in *Nardone* v. *United States, supra,* 308 U.S. 338, 341. That case involved evidence acquired through the use of illegal wiretaps. The Court, speaking through Mr. Justice Frankfurter, said:

"* * * Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. A sensible way of dealing with such a situation * * * ought to be within the reach of experienced trial judges. The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here— the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial

---

[8] We cannot agree with the State's contention that defendant's claim rested on his testimony that at the start of the interrogation Officer Kasparovitch spoke to him about the police having the automobile parts. Defendant earlier had testified that he was told about this while riding down to the police station.

portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."

As interpreted in the well-reasoned opinion in *United States* v. *Goldstein*, 120 F.2d 485, 488 (2d Cir.), *affirmed on the ground of lack of standing, sub nom., Goldstein* v. *United States*, 316 U.S. 114:

"That language cannot indeed serve as a ruling that the prosecution has the burden to show how far its proof has 'an independent origin,' but it is consonant with that position and to some extent suggests it. In any event it appears to us that this should be the rule * * *. * * * [A]fter the accused had proved that the 'taps' had been made and had to some extent been used to break down Messman * * *, the burden fell upon the prosecution to satisfy the district judge that they had no part, or no substantial part, in that result."

While the outcome of the *Goldstein* case upon further appeal[9] reduces the above-quoted statement to dictum, it nevertheless is helpful dictum. In *Costello* v. *United States*, 365 U.S. 265, 278-80, petitioner contended that certain admissions, made before a 1943 New York grand jury as to bootlegging activities during Prohibition, were impelled by the belief that the New York prosecutor already had the answers to the questions from illegal wire-

---

[9] As above noted, the case was affirmed upon the ground of lack of standing of the accused to invoke the protection of the statute outlawing the wiretaps. The Court of Appeals had gone into other aspects of the case. It held that the trial judge had made no direct finding as to the effect of the wiretaps, and had found only that the accused failed to prove that the wiretaps had contributed to the breakdown of witnesses who testified for the Government. The Court of Appeals therefore thought that if the accused had standing, the issue of burden of proof was decisive. The Court of Appeals stated that if the trial judge had made a direct finding that the wiretaps contributed nothing to the breakdown of the witnesses, that finding would not have been disturbed. It is noteworthy that the government witnesses involved both testified that the wiretaps had not influenced them at all.

taps made in 1943. The Court concluded, however, "from the record," that there was another explanation for petitioner's admissions, saying:

> "The short answer to this contention is that we conclude from the record that his truthful answers to Mr. Hogan's questions were not given because he thought that the conversations tapped in 1943 revealed his activities in the Prohibition era, but because he realized that these facts had been known to the authorities for some time. *None of Mr. Hogan's questions even implies that Mr. Hogan gained his information from the 1943 wiretaps.* Mr. Hogan had a transcript of the 1939 federal grand jury minutes of the petitioner's appearance before that body. The petitioner presses no argument in this Court that his admissions before that grand jury were infected with wiretapping. Early in Mr. Hogan's examination, the petitioner admitted that he recalled being questioned before the grand jury in 1939. The questioning at that proceeding had elicited the petitioner's admission of his bootlegging. * * *" (Emphasis added.) (365 U.S. at 278-79.)

Here the State made no showing—none we can consider in this case—that defendant's confession was impelled by circumstances other than his knowledge that the police had the stolen parts. What showing might be made upon remand of the case need not be speculated upon. The present record is insufficient to permit us to uphold the trial court's ruling.[10] We do not feel justified

---

[10] The State points to the fact that Officer Ragsdale's statement on the way to the station did not evoke a confession at the time. The State further contends that defendant's statement to Officer Kasparovitch that "I want to get it off my chest," as testified by the officer, shows an independent origin or as put in the State's brief "an independent origin and desire to cleanse his mind of whatever guilt existed." The difficulty is, however, that Officer Ragsdale's use of the illegal search and seizure to induce a confession came early in the chain of circumstances, so that what followed had to be considered in that light. The record affords insufficient support for the conclusion that defendant had an independent desire to confess apart from his feeling as to the hopelessness of his case.

in regarding as substantial evidence of an independent origin of the confessions such information as, by surmise and inference, it may be supposed defendant possessed concerning his accomplices having implicated him, dependent upon what may have been conveyed to defendant by members of his family, specifically his father who was given "a brief summary of what had taken place prior to that time [the afternoon of the arrest.]"[11] The trial court could not have ruled on the suggested basis, since direct evidence that Kitashiro's accomplice Otake had implicated him was excluded by the trial court. The error of the trial court lay in its failure to recognize that, on the record before it, rebutting evidence of an independent origin of the confession was not only relevant but necessary in order for the trial court to exercise its fact-finding prerogative in respect of the contention that the confession was tainted. Otherwise the record admitted of but one conclusion.

The trial court found, in ruling on this branch of the case, that it was "very important * * * that the father of the defendant talked to his son for not less than 15 minutes, and part of his talk was, 'Don't say anything about this case. Follow whatever your lawyer says.'" This is a strong factor upholding the voluntariness of the confession, since it shows that defendant had no reason to feel defenseless. But it is in no way inconsistent with the conclusion that he felt his situation was hopeless because the stolen parts had been found in his home, and confessed for that reason.

We take note of a line of cases in which advice of counsel has been held to insulate a second confession from a first confession excluded under the *McNabb-*

---

[11] Other members of the family, so far as appears, were simply told that the police had reason to believe defendant was implicated and was supposed to have taken parts from the stolen vehicle.

*Mallory* rule. *Goldsmith* v. *United States,* 277 F.2d 335, 340, 342 (D.C. Cir.) and *Jackson* v. *United States,* 285 F.2d 675 (D.C. Cir.), as explained in *Killough* v. *United States,* 315 F.2d 241 (D.C. Cir.). This line of cases stems from *United States* v. *Bayer,* 331 U.S. 532, 539-41, which stresses the removal of the conditions calling for exclusion of the first confession under the *McNabb-Mallory* rule. In any event, in the absence of evidence of an actual consultation with counsel there is no room for an inference that the causal connection between the illegal searches and seizures and the confession had become attenuated under this line of cases.

On the evidence in this record defendant's confession should have been excluded altogether. Reversed and remanded for a new trial or other proceedings consistent with this opinion.

*Yukio Naito* (*Shim & Naito* of counsel), for defendant-appellant.

*Herbert H. Tanigawa,* Deputy Prosecuting Attorney, City and County of Honolulu (*John H. Peters,* Prosecuting Attorney, and *Bert S. Tokairin,* Deputy Prosecuting Attorney, with him on the briefs) for the State, appellee.

---

CONCURRING OPINION OF MIZUHA, J.

I join in Part II of the opinion of Lewis, J., and in the judgment of the court. In my opinion there is no occasion to go into the subject matter of Part I.

---

DISSENTING OPINION OF CASSIDY, J., WITH
WHOM TSUKIYAMA, C. J., JOINS.

I concur in Part I of Justice Lewis' opinion but dissent from the holding of the majority of the court reversing the conviction on the grounds that the defendant's confession was tainted and inadmissible by reason of the fact, or of the manner in which, the police officers imparted information to the defendant that they had obtained the parts he had received of the stolen automobile, which parts, upon defendant's application, had been excluded from evidence by the trial court as illegally seized in contravention of the Fourth Amendment of the Federal Constitution and Article I, Section 5 of the State Constitution.

I am unable to agree that there is a sufficient causal connection shown in this record between the automobile parts seized from the garage at the defendant's home and the confession he gave to the police to warrant its exclusion on any theory that it was tainted. Further, this court should be bound by the trial court's resolution of the issue.

As the majority points out, the rule of evidence upon which the appellant bases his case on the point under consideration was first enunciated in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385. That case laid down the rule that the Government may not use derivative evidence produced from following up information obtained by a search and seizure made in contravention of the Fourth Amendment. This rule was held also applicable to use of evidence derived from information illegally obtained by wiretapping in *Nardone v. United States,* 308 U.S. 338, another bench mark in the field under consideration. In *Nardone,* the exclusion of evidence derived from an illegal act was analogized to the use of the "fruit of the poisonous tree." The Silverthorne exclusionary rule has carried that label ever since.

There is no question but that the fruit of the poisonous tree rule applies to a confession which directly stems from and is tainted by an unlawful search and seizure. *Fahy* v. *Connecticut,* 375 U.S. 85; *State* v. *Evans,* 45 Haw. 622, 372 P.2d 365. Part and parcel of the rule, however, is the cognate principle that notwithstanding there may have been an unlawful search and seizure, the Government is not precluded from using the facts thus obtained in building its case if it had acquired the same information from an independent source. The exposition of the two facets of the rule is given in the *Silverthorne* case at p. 392, as follows:

"\* \* \* The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. \* \* \*"

The independent source doctrine permitting the purge of original taint from an illegal search or seizure has become as firmly established as the exclusionary portion of the rule established by the *Silverthorne* case. And it is well settled that evidence comparable to that discovered or derived from information obtained by an illegal seizure is not per se inadmissible.

Close to home is *Warren* v. *Territory,* 9 Cir., 119 F.2d 936 (decided on appeal from this jurisdiction), in which it is stated at p. 938 on authority of the *Silverthorne* case that:

"[K]nowledge of facts gained from a proper independent source such as here obtained may be used,

though it also may be obtained from an illegal act."

Recently, in *Wong Sun* v. *United States,* 371 U.S. 471, it was asserted in respect to the independent source doctrine (at pp. 487-488) :

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality' or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)."

It can be accepted, as argued, that when primary illegality has been shown, the prosecution has the burden of proving that the controverted evidence had an independent origin or was produced from leads provided by an independent source. See *United States* v. *Goldstein,* 2 Cir., 120 F.2d 485, 488.

In our case, the prosecution definitely sustained the burden imposed on it in that respect. There can be no other conclusion from the evidence but that the police officers had been informed by the defendant's confederates, before the officers went to the defendant's home on their first visit on November 14, 1962, that the defendant had actively participated in stealing the complainant's automobile and that he had received some of the parts subsequently stripped from it.

It is difficult for me to conceive of a simpler situation in which the independent source doctrine could and should operate. Here, the interrogation of defendant, including questioning him relative to the stripping of the automobile and the distribution of the parts, was not "come at by exploitation" of the illegal seizure. It fol-

lowed, rather, as a matter of course and ordinary duty from what the police investigation had revealed on defendant's complicity in the crime prior to the seizure of the carburetor and manifold from the garage at his home. *Harlow* v. *United States*, 5 Cir., 301 F.2d. 361, 372-373; *Wiggins* v. *United States*, 9 Cir., 64 F.2d 950, 951. Further, I cannot agree that this court can properly hold that the confession given by defendant was infected by reason of what transpired between any of the police officers and the defendant between the time he was picked up at his home at 3 p.m. on the day in question and his confessing a few hours later.

Defendant's claim that his confession was tainted rests on his testimony respecting conversations with a police officer on the way to the police station and with Officer Kasparovitch prior to the latter's questioning him at the police station.

In respect to the conversation on the trip to the station, the gist of the defendant's testimony, in which tailor-made leading questions of counsel played a prominent part,[1] was that an officer told him that the police had the parts from the garage closet, and so he had to confess.

---

[1] "MR. NAITO [defense counsel]: Now, at the time of your arrest at your residence, did the officer mention anything to you about any automobile parts?

"WITNESS: Well, I heard someone say that 'we have the parts already.'

"Q (By Mr. Naito) Did they tell you where they got the parts?

"A Yes. From the garage closet.

"Q And this—was this told to you?

"A Yes, I think so.

"Q Did the officer say anything about making a confession because he had the parts?

"A While we were riding down to the police station.

"Q While you were riding in the automobile going down to the police station?

"A Yes.

"Q Which officer said that to you?

"A I don't remember.

"Q Was there a general conversation going on in the automobile regarding this case?

"A Yes.

While Officer Ragsdale admitted he told the defendant on the way to the police station that the police had certain automobile parts taken from defendant's home, his version of the remainder of the discussion between the two is not the same as that of the defendant. The officer testified:

"A * * * I told him I had the parts—'You may as well tell the truth as to what happened'—because at that time he was very quiet. I asked him a question and he didn't say anything; so I just said, 'Let's tell the truth. What happened?' "[2]

At the police station the defendant was held in an interrogation room for about three hours without anyone questioning him on the case, while Officer Kasparovitch, who was in charge of the investigation, questioned the other three participants in the theft of the automobile. Each of them implicated the defendant. When that phase of the investigation was completed, Officer Kasparovitch went into the interrogation room in which the defendant had been waiting to question him.

Defendant's claim is that Kasparovitch immediately told him he might as well confess as the police had the parts. The defendant concluded by testifying that the only basis for his confession was that he felt the police had the parts and he might as well tell. Defendant's full testimony in that respect is as follows:

"Q When Officer Kasparovitch came into the inter-

---

"Q  Do you recall how many times he told you that they had the parts so you had to confess?

"A  Yes—no, I don't remember exactly how much, but they told me quite a few times.

"Q  They kept repeating it, is that correct?

"(Witness nodding.)"

[2] As to the effect on a confession of an admonition to tell the truth, see *Territory* v. *Summgat*, 38 Haw. 609, 613-614; *Territory* v. *Young*, 37 Haw. 189. In the latter case it is stated at p. 195: "Mere exhortation or adjuration to speak the truth does not render a confession incompetent."

rogating room, what did he tell you as soon as he came in?

"A He told me, 'Are you ready to confess?' He told me, 'You might as well. We have the parts.'

"Q Did he say, 'You might as well. We have the parts'?

"A Yes.

"Q Now, what was your response?

"A I said I was ready.

"Q Why did you say you were ready to confess?

"A Because I felt that I wasn't—there wasn't anything I could do.

"Q Did Officer Kasparovitch tell you that the others had confessed and implicated you?

"A Yes.

"Q When did he tell you this?

"A Within that same time.

$$*\quad*\quad*\quad*\quad*$$

"MR. NAITO: When did he tell you that the others had confessed?

"WITNESS: It was after.

"THE COURT: After what?

"WITNESS: It was later on because the first thing he told me was, 'Are you ready to confess?'

"MR. NAITO: Now, you stated that you confessed because you felt that they had the parts; so you felt you might as well tell?

"WITNESS: Yes.

"Q (By Mr. Naito) Now, was this the only basis for your confession?

"A Yes."

Kasparovitch's testimony is completely at odds with that of the defendant on this major point of the defendant's case. The officer testified as follows:

"Q And at that time was his father mentioned in any way?

"A Yes. When I first went in there, I asked if he wanted to eat. He said no, he wanted to get it off his chest and continue. And I said, 'Did your father talk to you about your attorney not wanting you to say anything to me?' And he said, 'Yes, but I want to get it off my chest and I want to talk about it.' So I said, 'Okay, let me have your story.'

"Q Then he gave you an oral statement?

"A Then he gave me an oral statement.

\*   \*   \*   \*   \*

"Q After you took this oral statement from Kitashiro, what, if anything, happened?

"A I asked him if he wanted to give me a stenographic statement and he agreed to do so.

"Q Did you take a stenographic statement?

"A Yes, I did."

Kasparovitch denied he mentioned anything about automobile parts before questioning the defendant.

That the countervailing effect of Kasparovitch's testimony on defendant's claim was not missed at the trial level is reflected in the questioning of the witness by defendant's counsel on cross-examination, as follows:

"Q According to your story, he told you he already talked to his father?

"A Yes, sir.

"Q And his father warned him he should talk to a lawyer and not say anything?

"A He told me his father told him not to say anything.

"Q But in spite of that he wanted to make a clean breast of it?

"A Yes, sir."

Further, the defendant admitted on cross-examination

that he told Kasparovitch he wanted to talk and get it off his chest.

There are other features in evidence that bear on and should be considered in determining the issue.

Officer Kasparovitch testified that in a brief confrontation of defendant with Otake during the time the officer was questioning Otake, Otake implicated defendant. On objection of defendant, the court ruled that the evidence would be confined to Otake's case. The ruling was undoubtedly correct insofar as the hearing on the merits was concerned. However, the court was then also entertaining the motion to suppress the confession. Otake's testimony was clearly pertinent to the motion and it should have been admitted against Kitashiro for that limited purpose. While as stated by the majority, we cannot, in view of the ruling, consider the evidence on this appeal, it nevertheless appears to me that other evidence in the record permits inferring the equivalent of what the rejected evidence tended to prove, namely, that before he was questioned by Kasparovitch, and, for that matter, before he left his home in custody of the police officers, defendant was aware that his part in the theft had been revealed to the police by some of his accomplices.

It is in evidence that when the police officers went to the defendant's home on the morning of November 14, 1962, they first met the defendant's aunt, and told her of what they had learned prior to that time. The same story was related in turn to a younger woman in the household, and then to the defendant's mother over the telephone. On the return of the police to the defendant's home in the afternoon, the story was again told to defendant's father,[3] who then asked for and was given an

---

[3] Officer Ragsdale's testimony respecting his conversation with the father at the home on the afternoon of the arrest was as follows:

"A  I told him who I was. I identified myself. And he more or less had an idea of the purpose of the police coming to the house.

opportunity to speak to his son in private. Judging this evidence in light of ordinary family relationships and according to common experience of mankind, a natural, rational and, I think, permitted inference is that the defendant knew before he got into the officers' car to be taken to the police station that one or more of his companions had given the police the full story on the commission of the crime. For the same reason it can be inferred that Ragsdale was telling the defendant no more than he already knew when he informed him that the police had obtained the automobile parts from the garage.

Another significant factor to be considered is that the defendant's father talked to him again at the police station, and told him to follow counsel's advice not to say anything about the case.

Considering all the circumstances in evidence, I can reach no other conclusion than that the illegality of the search and seizure in this case was too thinly connected to the taking by Kasparovitch and the giving by the defendant of the confession in evidence to permit or require a holding that it was tainted. I consequently cannot agree that it can be held as a matter of law that the confession should have been excluded as fruit of the illegally seized articles.

I do not find anything in the cases cited on behalf of appellant which warrants or justifies a reversal of the trial court's ruling admitting the confession over the objection under consideration.

While the main authorities relied on by appellant

---

"Q   What did Mr. Kitashiro do?

"A   He just wanted to find out more about the circumstances. He was very cordial.

"Q   Who did he talk to?

"A   He spoke with me.

"Q   You say he wanted to talk with someone?

"A   No, he just wanted to find out how come the boys were involved; so I gave him a brief summary of what had taken place prior to that time."

may, by selected quotations from them, be made to appear to support his position, in my opinion, they do not, on scrutiny, bear it out.

*People* v. *Rodriguez,* 11 N.Y.2d 279, 229 N.Y.S.2d 353, 183 N.E.2d 651, from a factual standpoint, may be distinguished as, in that case, unlike this one, the defendant was directly confronted, when his confession was taken, with a gun and other articles which may have been illegally seized from his room. As is reflected in the quotation from the case set out in the majority opinion, the fact the defendant was confronted with the gun and articles was considered, and properly so, as an important factor in the court's ruling. However a highly significant point to be noted is that the court did not hold, even with the confrontation, that the confession would be inadmissible as a matter of law if the seizure was found on remand to have been illegal. More will be said later in that connection.

In *Commonwealth* v. *Spofford,* 343 Mass. 703, 180 N.E.2d 673, the evidence declared inadmissible by the appellate court was obtained only by the lead produced by confronting the defendant with and questioning him on photographs that had been illegally seized from his abode. The evidence was held to be "branded with the original taint" because it was solely by direct use of the illegally seized photographs that the challenged evidence was obtained. The *Spofford* case, not ours, presents the type of situation where it is proper to declare the derivative evidence an "offshoot" of the illegal seizure.

In *Hall* v. *Warden,* 4 Cir., 313 F.2d 483, as the prevailing opinion here points out, the court treated the question of the admission of defendant's confession which might have followed the defendant's ascertaining that certain illegally seized articles were in the possession of the police, as one of voluntariness. While it seems to me

that the majority is actually applying the ordinary voluntariness test when it speaks of the defendant being left to meditate for three hours, "while the corrosive properties of the poison so instilled [by Ragsdale] had their intended effect," no contention has been made, nor could any be made, that Kitashiro's confession was not, in fact, voluntary. On that score there can be no doubt on the record in this case that, to borrow apt language from *People* v. *Freeland*, 32 Cal. Rptr. 132, at pp. 136-137, "The circumstances smack of catharsis rather than the knout."

I read *Costello* v. *United States*, 365 U.S. 265, as negating rather than supporting appellant's contentions. The import of the independent source doctrine and its applicability to this case readily appears from what the court states at pp. 278 and 280:

> "The contention that illegal wiretapping precluded reliance upon the petitioner's admissions rests primarily upon interrogations by New York County District Attorney Frank Hogan in 1943 when the petitioner appeared before the New York County grand jury and the Official Referee in the Appellate Division. State officers had a tap on the petitioner's telephone during several months of 1943. Mr. Hogan made frequent references to the tapped conversations when questioning the petitioner. The petitioner claims that his admissions of bootlegging activities during Prohibition were impelled by the belief that Mr. Hogan had learned from the tapped conversations the information sought by the questions. It is argued that the wiretaps were illegal under our decision in *Benanti* v. *United States*, 355 U.S. 96, and that his admissions were therefore to be excluded from evidence as 'fruit of the poisonous tree,' on the reasoning in *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, and *Nardone* v. *United States*, 308 U.S. 338.

* * * * *

"It is true that the 1943 wiretaps prompted the calling of the petitioner before the county grand jury and the Official Referee. But the 'fruit of the poisonous tree' doctrine excludes evidence obtained from or as a consequence of lawless official acts, not evidence obtained from an 'independent source.' *Silverthorne Lumber Co.* v. *United States, supra,* at 392. \* \* \* We are satisfied that any knowledge in Mr. Hogan's possession which impelled the petitioner to answer truthfully came from such independent sources and that any connection between the wiretaps and the admissions was too attenuated to require the exclusion of the admissions from evidence."

I think that an analysis of the pertinent evidence, in light of the authorities, permits only the conclusion that the defendant's confession was not a product of nor was it tainted by the illegal seizure. However, even if a different conclusion could be reasoned out from the cold record, as the majority does in independently evaluating the evidence and the inferences to be drawn from it, that would still not warrant a reversal.

The issue presented by appellant's claim, asserted on the stand, that the reason he gave the confession was because he "felt that they had the parts," so he felt he "might as well tell," was one of fact. As such, it was for the trial court to resolve. This is recognized and accepted by all of the authorities in the field we are now dealing with. The point is clearly brought out in *People* v. *Rodriguez, supra,* 11 N.Y.2d 279, 229 N.Y.S.2d 353, 183 N.E.2d 651, relied on heavily by appellant. In that case it is stated, at p. 654:

"Upon the new trial, therefore, it will be incumbent on the trial court, in connection with the defendant's motion to suppress the challenged statements (see Code Crim. Proc., §§ 813-c, 813-d, 813-e, as added by

L.1962, ch. 954, § 1), to hold a hearing in advance of the trial and decide the issues presented, namely, whether there was an illegal search and seizure and, if there was, whether Rodriguez' confession was induced by confrontation with the illegally obtained articles."

Similarly in *Fahy* v. *Connecticut, supra,* 375 U.S. 85, the remand put the issue back to the trial court to decide, the Supreme Court stating, at pp. 90-91:

"* * * But the defendants were not allowed to pursue the illegal search and seizure inquiry at trial, because, at the time of trial, the exclusionary rule was not applied in Connecticut state courts.[4] Thus petitioner was unable to claim at trial that the illegally seized evidence induced his admissions and confession. * * * Thus petitioner should have had a chance to show that his admissions were induced by being confronted with the illegally seized evidence."

In *Nardone* v. *United States, supra,* 308 U.S. 338, it is said at p. 341:

"* * * Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. *A sensible way of dealing with such a situation*—fair to the intendment of § 605, but fair also to the purposes of the criminal law—*ought to be within the reach of experienced trial judges. * * *"* (Emphasis added.)

It was vital to the appellant's case that his testimony be given credence, which the trial judge did not do. Instead, the judge expressly stated that he did not believe the defendant and that he did believe Kasparovitch. We are therefore confronted with a situation which calls for

---

[4] The trial took place before *Mapp* v. *Ohio,* 367 U.S. 643, was handed down.

application of the fundamental principle of appellate review that there shall not be a reversal for any finding of fact depending on the credibility of witnesses or the weight of the evidence. *Territory* v. *Young,* 32 Haw. 628, 634; *Territory* v. *Rodrigues,* 41 Haw. 50, 52; *State* v. *Hassard,* 45 Haw. 221, 231, 365 P.2d 202, 207. The rule is the same whether the determination of fact be by a jury or a judge. *Territory* v. *Hart,* 35 Haw. 582, 590-591. This rule has not been altered by the adoption of the Hawaii Rules of Criminal Procedure. *State* v. *Tamanaha,* 46 Haw. 245, 251-252, 377 P.2d 688, 692.

As a result of weighing the evidence and determining the credibility of the witnesses, with the benefit we do not have of observing them on the stand, the trial judge found that appellant's claim was not substantiated. He expressly declared: "I don't believe the defendant when he said that he confessed because they had the goods." What was said in *United States* v. *Goldstein, supra,* 2 Cir., 120 F.2d 485, referred to in the prevailing opinion, is therefore particularly pertinent. The application of the fundamental principle governing the scope of appellate review of factual findings that should be adhered to in this case is there exemplified by the court's statement, at p. 488: "However, if the judge had affirmatively found that the 'taps' contributed nothing to this result, we should not have disturbed the finding." *Cf., Davis* v. *United States,* 328 U.S. 582, 593; *Burke* v. *United States,* 1 Cir., 328 F.2d 399, 402-403.

In my opinion the experienced trial judge's ultimate finding of fact on the issue herein covered rests upon substantial evidence and warrants the recognition and acceptance which *Goldstein* indicates it should be given. With all deference, it appears to me that the majority's failure to do so is a departure from the established standard governing appellate review of findings of fact.

I would affirm the conviction.